276 P.3d 660

**STATE of Hawaiʻi, Respondent/Plaintiff–Appellee,**

v.

**Glenn KEOHOKAPU, Jr., Petitioner/Defendant–Appellant.**

**No. SCWC–29937.**

Supreme Court of Hawaiʻi.

May 15, 2012.

Cynthia A. Kagiwada, for petitioner.

James M. Anderson, deputy prosecuting attorney, for respondent.

ACOBA, DUFFY, and McKENNA, JJ.; with RECKTENWALD, C.J., Concurring and Dissenting, with whom NAKAYAMA, J., Joins.

Opinion of the Court by ACOBA, J.

We hold in this case that the process by which a jury was selected for the trial of Petitioner/Defendant–Appellant Glenn Keohokapu, Jr. (Petitioner) did not result in substantial prejudice to Petitioner notwithstanding the pretrial publicity to which some jurors were exposed, and we therefore affirm the June 22, 2009 judgment of conviction for manslaughter entered by the Circuit Court of the First Circuit (the court),[1] and, to the same extent, the October 6, 2011 judgment of the Intermediate Court of Appeals (ICA) filed pursuant to its September 22, 2011 summary disposition order (SDO),[2] see State v. Keohokapu, No. 29937, 2011 WL 4426889 (Haw.App. Sept. 22, 2011). However, we vacate Petitioner's extended term sentence and remand for disposition of the case consistent with this opinion inasmuch as we hold that as to the extended sentencing proceedings (1) where the jury must determine whether an extended term of imprisonment is necessary for the protection of the public it is error to instruct the jury that the extended term sentence includes the possibility of parole; (2) and, additionally, that in this case it was error to admit the statement of one of the witnesses during the sentencing phase as past recollection recorded; and (3) these errors were not harmless beyond a reasonable doubt.

1. The Honorable Virginia L. Crandall presided.

2. The SDO was filed by the Presiding Judge Daniel R. Foley, the Honorable Alexa D.M. Fujise, and the Honorable Lisa M. Ginoza.

## I.

The following essential matters are from the record and the submissions of the parties.

## A.

On the night of June 7, 2008, Petitioner, Petitioner's wife, Kauilani Keohokapu (Kauilani),[3] and Petitioner's brother went to club "Komo Mai." Decedent Steven Wilcox and his friend Robin Gregory also were at the club. At some point, Petitioner became upset because Gregory was allegedly staring at Kauilani. Petitioner left the club and went outside to his car. Kauilani followed Petitioner, and the two allegedly began to argue. Later, Petitioner's brother came out of the club to the car, and it appears that the three argued.

During the argument, Petitioner's brother grabbed Kauilani's arm and pushed her away from the car. At that moment, Wilcox came out of the club, approached the car, and said something to the effect of, "That's one female." Petitioner, who was sitting in the car, got out and said, "[T]hat's my wife." Petitioner and Wilcox then began to fight. At one point, witnesses stated that they saw Petitioner with a metal object or a knife in his hand. Sometime during the fight, Petitioner and Wilcox collided, and Petitioner stabbed Wilcox in the chest. Petitioner then went back to his car and drove away. On June 8, 2008, Wilcox died as a result of the stab wound.

## B.

On June 12, 2008, Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) charged Petitioner with murder in the second degree, Hawai'i Revised Statutes (HRS) §§ 707–701.5 (1993)[4] and 706–656 (1996).[5] On June 23, 2008, Respondent gave Petitioner notice that he was eligible to be sentenced to an extended term of imprisonment as a persistent offender pursuant to HRS §§ 706–661 (Supp.2008)[6] & 706–662(1) (Supp.2008)[7].

**3.** Kauilani Keohokapu is referred to by her first name in order to distinguish her from Petitioner.

**4.** HRS § 707–701.5 (1993) provides:

**§ 707–701.5. Murder in the second degree** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person. (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

**5.** HRS § 706–656 (1996) provides:

**§ 706–656. Terms of imprisonment for first and second degree murder and attempted first and second degree murder** (1) Persons convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without possibility of parole. As part of such sentence the court shall order the director of public safety and the Hawai'i paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment. (2) Except as provided in section 706–657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with the possibility of parole. The minimum length of imprisonment shall be determined by the Hawai'i paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

If the court imposes a sentence of life imprisonment without possibility of parole pursuant to section 706–657, as part of that sentence, the court shall order the director of public safety and the Hawai'i paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

**6.** HRS § 706–661 (Supp.2008), referenced in § 706–662, provides:

**§ 706–661. Extended terms of imprisonment.** *The court may sentence* a person who satisfies the criteria for any of the categories set forth in section 706–662 to an extended term of imprisonment, which shall have a maximum length as follows:
(1) For murder in the second degree-life without the possibility of parole;
(2) For a class A felony-indeterminate life term of imprisonment;
(3) For a class B felony-indeterminate twenty-year term of imprisonment; and
(4) For a class C felony-indeterminate ten-year term of imprisonment.

The July 23, 2008 minutes of the court reflect that the subject of pretrial publicity was discussed on that date, but there is no record of the proceedings. On March 12, 2009, the court held a hearing to resolve several pending motions. At the conclusion of the hearing, Petitioner's counsel reminded the court that there had been news reports about Wilcox's peaceable nature, which Petitioner's counsel claimed were simply "not true."

Jury selection began on March 17, 2009, and lasted six days. On the first day of jury selection, the court informed the first panel of prospective jurors that "[t]here was some publicity with respect to this case[,] and made the following statement (publicity statement):

It was reported that on June 8, 2008, in the parking lot of Club Komo Mai in Kaneohe [Petitioner] Glenn Keohokapu, Jr., allegedly fatally stabbed 19–year–old Steven Wilcox after Wilcox intervened in an argument between [Petitioner] and his wife. Both [Petitioner] and Wilcox had consumed alcohol in Club Komo Kai. *Wilcox was described in the media as a good Samaritan.*

Would you please raise your hand if you believed you have read, hear, or know anything about this case.

For those of you who have raised your hand, thank you. We'll be discussing what you've read or heard individually with each of you, and the others of you will be—who have not read or heard anything will be returning on next week Tuesday.

(Emphasis added.) The prospective jurors in the second, third, and fourth panels were given the same appraisal. Petitioner claims

that "there is no record as to the discussion or formulation of this statement [and that] there is no record of whether the defense objected or not." The record reflects, however, that Petitioner did not object when the court read the statement to the jury panels.

The court conducted individualized voir dire of those jurors who indicated they had been exposed to pretrial publicity. Jurors who stated that they could not be fair and impartial due to media exposure were excused for cause.

Petitioner challenged for cause the remaining jurors who had heard of the case in the media, arguing that it would be difficult to ascertain whether the jurors could be fair and impartial, and, thus, it would be prudent to dismiss them all. The court rejected Petitioner's challenge for cause.

During the first day of the regular jury selection, Petitioner reiterated his challenge to those jurors seated in the jury box who had been exposed to pretrial publicity. The court again denied Petitioner's challenge. Nine out of the twelve jurors ultimately selected indicated that they had heard about the case through the television news, the newspapers, or both, and five stated that they recalled Wilcox had been referred to as a "Good Samaritan" or had helped by intervening in the dispute.

### C.

Petitioner's trial commenced on April 6, 2009. Petitioner argued that Wilcox, who was carrying brass knuckles on the night in question, was the first aggressor, and that Petitioner acted in self-defense. On April 20, 2009, the jury found Petitioner guilty of the included offense of manslaughter, HRS § 707–702.[8] On May 8, 2009, following the

---

*When ordering an extended term sentence, the court shall impose the maximum length of imprisonment. The minimum length of imprisonment for an extended term sentence under paragraphs (2), (3), and (4) shall be determined by the Hawai'i paroling authority* in accordance with section 706–669.
(Emphases added.)

7. HRS § 706–662 (Supp.2008) provides in relevant part:
 **§ 706–662. Criteria for extended terms of imprisonment.** A defendant who has been convicted of a felony may be subject to an extended term of imprisonment under section 706–661 if it is *proven beyond a reasonable doubt that an extended term of imprisonment is*

*necessary for the protection of the public and* that the convicted defendant satisfies one or more of the following criteria:
 (1) The *defendant is a persistent offender in that the defendant has previously been convicted of two or more felonies committed at different times when the defendant was eighteen years of age or older;*
 (Emphases added.)

8. HRS § 707–702 (Supp.2006) provides:
 **§ 707–702. Manslaughter** (1) A person commits the offense of manslaughter if:
 (a) The person recklessly causes the death of another person; or
 (b) The person intentionally causes another person to commit suicide.

jury verdict, Respondent gave Petitioner notice that it intended to introduce evidence of Petitioner's past crimes during the sentencing phase of trial.

## D.

On May 27, 2009, the sentencing phase of Petitioner's trial began. Respondent introduced evidence that Petitioner had engaged in domestic violence against his wife on October 20, 1994, April 3, 1996, July 13, 1996, and on two other occasions, one sometime in January 2008 and the other on March 9, 2008. Respondent also introduced evidence that Petitioner had allegedly attacked a man named Gregory Balga on October 23, 1993. The jury also heard that Petitioner had committed four other felonies, one of which involved violence toward another person, and that Petitioner had numerous misdemeanors on his criminal record.

### 1.

Respondent first called Petitioner's wife, Kauilani, as a witness. Kauilani testified that on April 3, 1996, while she and Petitioner were still dating, she attempted to leave the apartment she and Petitioner shared. Respondent asked Kauilani whether Petitioner was holding her back from leaving, to which Kauilani answered that she did not remember because the incident had occurred "back in '96." Respondent inquired whether Kauilani had filed a police report the day after the incident, and Kauilani responded that she had.

Respondent then showed the report to Kauilani. Kauilani indicated that she had filed the report, that she recognized the handwriting as hers, and that her signature was on the bottom of the report. Respondent asked the court for permission to approach Kauilani, which was granted. It is not clear from the record whether Respondent retrieved the report. Respondent asked Kauilani whether the report "re-

fresh[ed] her recollection," to which Kauilani answered in the affirmative.

Respondent asked Kauilani whether Petitioner had grabbed her because he did not want her to leave. Kauilani responded, "It says that he slapped me.... On the paper it says he slapped me." Respondent questioned, "This is your statement, right?" and Kauilani agreed. Respondent asked, "And you wrote it when this incident occurred? You wrote it the day after the incident occurred; is that right?" Kauilani responded that she did not want to "dig back up" that part of her life, but agreed that she had written the statement. Kauilani then testified that she and Respondent had argued, and that Petitioner had slapped her on the face several times, grabbed her neck, threatened to kill her, and locked her in the apartment for about an hour. Petitioner claims that the record does not reflect that Respondent ever retrieved the police report from Kauilani when she was testifying.

### 2.

Kauilani also testified about another incident of domestic abuse that occurred on July 13, 1996. On that occasion, Petitioner pulled Kauilani's hair, head-butted her, and bit her in the eye. As a result of the incident, Kauilani suffered a black eye, scratches, and injuries to her ears.

### 3.

Respondent questioned Kauilani about a third incident that allegedly occurred on October 20, 1994, during which Petitioner bit Kauilani and pulled her by the stomach. During Kauilani's testimony, Petitioner's counsel asked whether Kauilani was reading from her police report.

[DEFENSE COUNSEL]: If she has it at the stand and she's testifying from it, *I'm going to object because there's a refreshed recollection, and I don't think the foundation has been laid for that. Other than for the first police report.* It seemed like

(2) In a prosecution for murder or attempted murder in the first and second degrees it is an affirmative defense, which reduces the offense to manslaughter or attempted manslaughter, that the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emo-

tional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be. (3) Manslaughter is a class A felony.

she's testifying from that. *So I missed it as to the second police report.* And this one. I don't think there was a request that her recollection be refreshed. *And if she is testifying from her statement, I would object to that.*

(Emphases added.) When Respondent asked Kauilani to clarify whether she was testifying from memory, she responded, "I told you this is a part of my life that I tried to forget. And yes, I'm reading it from the paper." Respondent later conceded that Kauilani's testimony concerning the October 1994 incident was erroneously admitted into evidence. *Keohokapu*, 2011 WL 4426889, at *5.

### 4.

Respondent then requested Kauilani to review a police report from July 13, 1996 involving another incident of domestic violence. Kauilani related that she had written the report the day after the incident, and that her signature was on both pages of the report. Respondent inquired whether the report helped Kauilani remember the events of July 13, 1996. Petitioner's counsel objected, arguing that foundation was lacking for admitting the statement in evidence. The court overruled the objection. Respondent asked Kauilani whether she remembered Petitioner head-butting and pulling her hair on July 13, 1996. Kauilani replied she did not because "this is 2009."

Respondent then attempted to move the entire report into evidence, and the court asked both counsel to approach the bench. Petitioner's counsel objected, contending that the entire document should not be admitted into evidence and that Respondent had not laid a proper foundation for Kauilani's testimony. The court overruled the objection, concluding that Respondent "laid sufficient foundation for past recollection recorded. And under the rule you read it into evidence."

Respondent then sought to read Kauilani's entire statement into evidence, but the court only allowed Respondent to read those paragraphs on which Kauilani had been questioned. Petitioner's counsel renewed his objection. The court permitted Respondent to read the following statement into evidence, over Petitioner's objection:

As to number 4, what happened, pulled my hair, hit me, head butt, bite, tear marks, he did this all because someone told him that I was seeing someone else and that I have someone's jacket.

Number 5, why did it happen, because he told me that I'm driving—I'm sorry. I'm driving him crazy, only last night he found out my number. I have a black and blue right eye, hardly here [sic] out of my right ear. A bit shoulder, and tear marks on my chest from [Petitioner], who is my ex-boyfriend, who I used to live with for one and a half years. I'm willing to prosecute.

Respondent then started to ask Kauilani about the October 20, 1994 report that had been discussed earlier but then withdrew the question.

### 5.

Additionally, Respondent introduced evidence that on March 11, 2008, Kauilani obtained a temporary restraining order (TRO) against Petitioner because sometime in January 2008, and again on March 9, 2008, Petitioner allegedly abused Kauilani by cutting her eye, striking her, pulling her hair, choking her, and head-butting her. The TRO was granted and remained in effect until June 9, 2008. In April 2008, Kauilani filed a report claiming Petitioner violated the TRO. Kauilani later testified that she sought the TRO because Petitioner was "run[ning] around with girls" and she wanted to get her car back from Petitioner, and not because she needed protection. Kauilani also reported that she had written a letter to the court asking for the TRO to be "dropped," and that she believed in April that the TRO was no longer in force.

### 6.

Respondent also called Gregory Balga to testify about an incident that took place on October 23, 1993. Balga testified that he had a drinking problem, was drinking heavily on the night in question, and, thus, could not remember whether Petitioner had visited his home on the night in question. Respondent showed Balga the police report he filed. Balga identified his writing, signature, and the date and time on the document, but indicated

he still could not recall what had happened. Petitioner objected when Respondent attempted to "move [the report] for identification." Respondent answered that it was attempting to refresh Balga's recollection, but, since Balga could not remember the incident, it would attempt to lay the foundation for "past recollection recorded."

Respondent inquired of Balga again whether his handwriting was on the report. Balga replied, "I don't remember writing it. I don't remember an officer there. I don't remember that. Like I said, I could have been drinking." Balga admitted that his name, address, social security number, age, date of birth, and phone number were on the report. Petitioner renewed his objection to Balga's testimony, but the court overruled it and allowed Respondent to read the following to the jury from the report:

> Number 4, what happened. [Petitioner] was accusing me for fooling around with his chick. . . . We both were talking downstairs and he kicked me in the face and I ran upstairs and he forced [sic] way—his way into the house and hit my sister trying to get into the house.
>
> After hitting my sister I tried to force him out and close the door, but [Petitioner] kept trying to push the door open. . . . At no time did I give Glenn permission to enter my house. . . .

### 7.

In addition to this testimony, Respondent called Honolulu Police Department (HPD) Officer Jon Yoshida. Officer Yoshida testified that on December 17, 1994, he arrested Petitioner for Robbery in the Second Degree, and that Petitioner had injured the complaining witness's mouth, jaw area, and chin area, and had bitten the witness's right triceps.

### 8.

HPD Officer Michael Wong testified for Respondent that on June 9, 2008, he had been assigned to arrest Petitioner in connection with a homicide case.[9] When he reached Petitioner's home, Officer Wong saw a female exiting the house, entering a car, and attempting to reverse the vehicle. Officer Wong related that he saw Petitioner "jump on to the front hood of the car[,]" break off one of the car's windshield wipers, and attempt to break the windshield with his fist.

### 9.

Respondent called Norma Ueno, supervisor of the criminal history records unit of the Hawaiʻi Criminal Justice Data Center. Ueno identified Respondent's Exhibit 10 as Petitioner's criminal history record. A redacted copy of the exhibit, Exhibit 10A, showing Petitioner's twenty convictions was admitted into evidence over Petitioner's objection. Petitioner does not appear to make any arguments in his Application concerning the admission of his criminal history.

### 10.

Respondent also introduced the testimony of police fingerprint examiner Judy Tamashiro, who compared Petitioner's fingerprints in this case against cases involving Burglary in the First Degree, Robbery in the Second Degree, Promoting a Dangerous Drug in the Third Degree, and Unlawful Use of Drug Paraphernalia, and determined that the fingerprints in all of those cases belonged to Petitioner. The court took judicial notice that all four offenses were felonies.

### 11.

Respondent called HPD Sergeant Stuart Yano, who testified that on December 6, 2002, he executed a search warrant of Petitioner's home and found a pipe used for ingesting crystal methamphetamine and six bags of a crystalline substance resembling crystal methamphetamine.

### 12.

Following Respondent's evidence, Petitioner moved for a judgment of acquittal on the ground that Respondent did not prove Petitioner was a persistent offender whose extended incarceration was necessary for the protection of the public. The court denied the motion. Petitioner then offered testimony from his mother, sister, and father. Over Respondent's objection,[10] Petitioner's parents and sister testified that Petitioner's father

---

9. It appears from Officer Wong's testimony that the homicide case referred to was this case.

10. Respondent objected that the testimony was not relevant because the question before the jury

physically abused Petitioner from ages six to seventeen. Petitioner's sister related that Petitioner's father also abused Petitioner's mother. Petitioner's mother reported that Petitioner had expressed regret.

### E.

During the settlement of jury instructions, Petitioner objected to two instructions, Court's Jury Instruction Nos. 2 and 4, concerning parole.[11] Petitioner also objected to Exhibit 6, which contained minutes generated by the Hawai'i Paroling Authority and Exhibit 10A which showed parole violations and criminal convictions.[12] The court overruled the objections.

The court instructed the jury that for the offense of Manslaughter, Petitioner could be "sentenced to a maximum indeterminate term of imprisonment of [twenty] years."[13] The court also explained to the jury that it was to answer special interrogatories regarding an extended term of imprisonment, which would "extend the maximum length of [Petitioner's] imprisonment for the offense of Manslaughter from twenty years of incarceration to life with the possibility of parole."

Over Petitioner's prior objection, the court orally gave the following instructions[14]:

> THE COURT: An indeterminate term of imprisonment is a sentence to imprisonment for the maximum period defined by law *subject to termination at any time after service of the minimum term of imprisonment determined by the Hawai'i Paroling Authority.*
>
> When a person has been sentenced to a term of imprisonment, the Hawai'i Paroling Authority shall as soon as practicable but no later than six months after commitment to the custody of the *Director of the Department of Public Safety hold a hearing and on the basis of the hearing make an order fixing the minimum term of imprisonment to be served before the prisoner shall become eligible for parole.*
>
> The Paroling Authority in its discretion may in any particular case and at any time impose a special condition that the prisoner will not be considered for parole unless and until the prisoner has a record of continuance [sic] exemplary behavior.
>
> After sixty days['] notice to the prosecuting attorney the Authority in its discretion

---

was whether Petitioner needed to be subjected to an extended sentence. Petitioner responded that it was important for the jury "to understand the source of any of the criminal ... problems [Petitioner] face[d]." The court overruled the objection.

11. Jury instruction no. 2 stated:
 When a person has been sentenced to a term of imprisonment, the Hawai'i Paroling Authority shall, as soon as practicable but no later than six months after commitment to the custody of the Director of the Department of Public Safety hold a hearing, and on the basis of the hearing make an order fixing the minimum term of imprisonment to be served before the prisoner shall become eligible for parole.
 Jury instruction no. 4 stated:
 The following provision of law relate [sic] to "parole", as defined in these instructions:
 No parole shall be granted unless it appears to the Hawai'i Paroling Authority that there is a reasonable probability that the prisoner concerned will live and remain at liberty without violating the law and that the prisoner's release is not incompatible with the welfare and safety of society.

12. The minutes in Exhibit 6 contained short summaries of previous actions by the Hawai'i Paroling Authority with respect to Petitioner's parole violations. Exhibit 10A showed Petitioner had committed several parole violations and that the

disposition of the cases was revocation of parole. Exhibit 10A also showed Petitioner's criminal convictions.

13. The jury was also charged in jury instruction No. 7 that
 [f]or the offense of Manslaughter, Defendant Glenn Keohokapu, Jr., may be subject to a maximum indeterminate term of imprisonment of twenty years.
 Petitioner did not object to this instruction.

14. The oral charge incorporated jury instructions Nos. 2, 3, 4, 5, and 6. Petitioner did not object to jury instructions Nos. 3, 5, or 6.
 Jury instruction no. 3 provided:
 Parole means a conditional release of a prisoner who has served part of the term for which he was sentenced to prison.
 Jury instruction no. 5 provided:
 You must not discuss or consider the subject of any action that the Hawai'i Paroling Authority may or may not take in your deliberations of the facts at issue in this hearing.
 Jury instruction no. 6 provided:
 An "indeterminate term of imprisonment" is a sentence to imprisonment for the maximum period defined by law subject to termination at any time after service of the minimum term of imprisonment determined by the Hawai'i Paroling Authority.

may reduce the minimum term fixed by the order.

*Parole means a conditional release of a prisoner who has served part of the term for which he was sentenced to prison.*

The following provision of law relates to parole as defined in these instructions.

No parole shall be granted unless it appears to the Hawai'i Paroling Authority that there is a reasonable probability that the prisoner concerned will live and remain at liberty without violating the law and that the prisoner's release is not incompatible with the welfare and safety of society.

You must not discuss or consider the subject of any action that the Hawai'i Paroling Authority may or may not take in your deliberations of the facts at issue in this hearing.

(Emphases added.)

The jury found, pursuant to special interrogatory no. 1, that Respondent proved beyond a reasonable doubt that Petitioner was a persistent offender in that he had committed two or more felonies at different times when he was [eighteen] years of age or older.[15] The jury also determined in response to special interrogatory no. 2 that Respondent proved beyond a reasonable doubt that it was "necessary for the protection of the public to subject [Petitioner] to an extended term of imprisonment, which would extend the maximum length of his imprisonment for the offense of Manslaughter from twenty years of incarceration to life with the possibility of parole[ ]."[16]

## II.

Petitioner appealed, and relevant here, argued to the ICA that the court erred (1) during jury selection (a) in failing to strike the jurors who had become acquainted with the case through the media because prejudice could be presumed from the pretrial saturation of publicity about the crime; (b) in reading to the entire venire the publicity statement which stated that the media had referred to Wilcox as a "Good Samaritan"; and (c) in formulating the publicity statement in Petitioner's absence, in violation of his right to be present during all stages at trial; and (2) during the sentencing phase (a) in admitting into evidence testimony under the "present recollection refreshed" and "past recollection recorded" exceptions to the hearsay rule; and (b) in instructing the jury on parole and the role of the Hawai'i Paroling Authority. *Keohokapu,* 2011 WL 4426889 at *1.

## III.

Regarding Petitioner's jury selection argument, the ICA held that nothing in the record suggested that media reports "saturated" the public to an extent warranting a presumption of prejudice. *Keohokapu,* 2011 WL 4426889 at *2. The ICA also disagreed with Petitioner's contention that the entire jury pool was tainted by the court's reading of the pretrial publicity statement. *Id.* at *3. As to Petitioner's contention that the formulation of the publicity statement violated his right to be present during all stages of trial, the ICA concluded that Petitioner had waived the argument by not raising it before the court. *Id.*

With respect to Petitioner's contention that the court erred during the sentencing hearing in admitting Kauilani's statements from April 3, 1996, July 13, 1996, and October 1994, the ICA concluded that Kauilani's "testimony regarding the 1996 statements to police were admissible" but that the October 1994 statement should have been excluded.[17]

15. Special interrogatory no. 1 stated as follows:

Has the prosecution proven beyond a reasonable doubt that the Defendant GLENN KEOHOKAPU, JR., is a persistent offender in that he has previously been convicted of two or more felonies committed at different times when he was eighteen years of age or older? (Your answer must be unanimous).

16. Special interrogatory no. 2 stated as follows:

Has the prosecution proven beyond a reasonable doubt that it is necessary for the protection of the public to subject the Defendant, GLENN KEOHOKAPU, JR., to an extended term of imprisonment, *which would extend the maximum length of his imprisonment for the offense of Manslaughter from twenty years of incarceration to life with the possibility of parole?* (Your answer to this question must be unanimous.)
(Emphasis added.)

17. The ICA accepted Respondent's confession of error with respect to the October 1994 statement. Neither party disputes that Kauilani's October 1994 statement was inadmissible, and, thus, we will not disturb the ICA's conclusion.

*Id.* at *3–4. The ICA also agreed with Petitioner that Balga's statement should not have been admitted. *Id.* Nevertheless, the ICA concluded that reversal was not warranted because the errors were harmless. *Id.* at *6.

Finally, with respect to Petitioner's argument that the court erred in giving jury instructions nos. 2 and 4 about parole, the ICA reasoned that the "instructions accurately state the procedures for determining the minimum term of imprisonment." *Id.* at *7. Further the ICA stated that jury instruction no. 2 did not tell the jury how much time Petitioner had to serve before becoming eligible for parole. *Id.* Lastly, the ICA noted that the court had instructed the jury in jury instruction no. 5 that it could not discuss or consider in its deliberations the subject of any action that the Hawai'i Paroling Authority might or might not take. *Id.*

## IV.

Petitioner lists the following questions in his Application:

1. Whether the ICA gravely erred by holding that [Petitioner] received a fair trial by an impartial jury where at least five of the seated jurors recalled pretrial publicity describing the decedent as a "Good Samaritan" and the trial court read a publicity statement indicating that the media had described the decedent as a "Good Samaritan"?

2. Whether the ICA gravely erred by determining that either no evidentiary errors occurred during the sentencing phase or that the errors which occurred were harmless?

3. Whether the ICA gravely erred by determining that no error occurred when the trial court instructed the jury on the irrelevant issues of parole and the role of the Hawai'i Paroling Authority during the extended term phase of trial?

Respondent did not file a Response to the Application (Response).

## V.

Before this court, as to the jury selection process, Petitioner argues that (1) the ICA erred when it held that Petitioner had waived his right to be present during the formulation of the publicity statement because (a) defendants have a constitutional right to be present at any stage of a trial where their substantial rights are affected; (b) Petitioner's substantial rights were affected, meaning that the issue could be raised on appeal; (c) it would appear disingenuous to require Petitioner to object when he was not present during the formulation of the statement and when the court did not make a record of the formulation or discussion of the statement; and (d) Petitioner was actually prejudiced by the statement that Wilcox had been portrayed as a Good Samaritan because Petitioner's defense was self-defense, and because the Good Samaritan statement would not have been admissible at trial; and (2) the ICA erred in concluding that the court was able to identify and dismiss biased jurors by conducting a thorough voir dire.

As to the evidence admitted during the sentencing phase, Petitioner argues that the ICA erred in (1) holding that since the defense did not object when Kauilani stated that her memory of the April 1996 incident was refreshed, the admission of her testimony was not a ground for reversal; (2) in deciding that Kauilani's July 13, 1996 statement was admissible as a past recollection recorded; (3) in concluding that the admissions of Kauilani's October 1994 statement and Balga's October 1993 statement were harmless. Petitioner maintains that these were "aggravating factors," and that, during the sentencing phase, the erroneous admission of such factors cannot be harmless.

Lastly, Petitioner argues that the ICA erred when it held that it was not error for the court to instruct the jury concerning parole in jury instructions nos. 2 and 4. Petitioner contends that (1) the ICA never addressed the issue of whether the jury instructions were irrelevant; (2) even if the instructions accurately stated the law, irrelevant instructions could only have misled and confused the jury; (3) cases from other jurisdictions hold that it is reversible error to instruct the jury concerning parole.

## VI.

Both the Hawai'i and the federal constitutions guarantee a criminal defendant the right to a trial by a jury "substantially

free from the biasing effects of inflammatory pre-trial publicity." *State v. Pauline,* 100 Hawai'i 356, 366, 60 P.3d 306, 316 (2002) (internal citation and quotation marks omitted). Once the accused claims that his or her right to a fair trial has been jeopardized by external influences, such as publicity, on the jury, the court must determine whether the influences rise to the level of being substantially prejudicial. *State v. Okumura,* 78 Hawai'i 383, 394, 894 P.2d 80, 91 (1995). "If it does not rise to such a level, the trial court is under no duty to interrogate the jury.... And whether it does rise to the level of substantial prejudice ... is ordinarily a question 'committed to the trial court's discretion....'" *State v. Williamson,* 72 Haw. 97, 102, 807 P.2d 593, 596 (1991) (quoting *State v. Keliiholokai,* 58 Haw. 356, 359, 569 P.2d 891, 895 (1977)).

■ Where, however, the court determines that outside influences are of a nature which could substantially prejudice the defendant's right to a fair trial, a rebuttable presumption of prejudice arises. *Williamson,* 72 Haw. at 102, 807 P.2d at 596. The trial judge is then duty-bound to investigate the totality of circumstances to determine the impact of the outside influence on the jury. *Id.*

### A.

■ As to Petitioner's first argument, the court apparently used the publicity statement in conjunction with questions of the jurors concerning media accounts of the incident and the jurors' ability to be fair.[18] Petitioner is correct that " '[i]t is well settled that an accused has a fundamental right to be present at each critical stage of the criminal proceeding.'" *State v. Walsh,* 125 Hawai'i 271, 285, 260 P.3d 350, 364 (2011) (citation omitted). But there is no authority for the

proposition, as Petitioner suggests, that a defendant has a right to be present during the "formulation" of the court's questions.

Further, Petitioner *was* present when the court read the publicity statement to the prospective jurors. Petitioner's alleged injury (the tainting of the jury) stems from the court's reading of the publicity statement to the jurors. Thus, Petitioner was present during the "stage of trial" in which his "substantial rights" could have been "adversely affected." *See Walsh,* 125 Hawai'i at 285, 260 P.3d at 364.

When the court read the publicity statement to the prospective jurors Petitioner could have objected. He did not. It was therefore not "disingenuous," as Petitioner claims, for the ICA to conclude that Petitioner failed to object to the court's use of the publicity statement. For the same reason, it was not error for the ICA to conclude that Petitioner forfeited his objection concerning the publicity statement.

### B.

■ Assuming *arguendo* that Petitioner did not forfeit his objection to the publicity statement, Petitioner was not substantially prejudiced by the statement. In *Pauline,* this court distinguished between presumed and actual prejudice:

A defendant need only demonstrate one of two different types of prejudice in support of a motion to transfer venue: *presumed* or *actual.* Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. Prejudice is rarely presumed because "saturation" defines conditions found only in extreme situ-

---

18. Because the court conducted further inquiry, the ICA inferred that the court had concluded that the media reports were substantially prejudicial, but not so saturating to warrant a presumption of prejudice. *Keohokapu,* 2011 WL 4426889, at *2. This inference, however, is not necessarily valid. *Williamson* provides that if the court concludes that outside influences are not substantially prejudicial, it is under no duty to interrogate the jury. 72 Haw. at 102, 807 P.2d at 596. Similarly, if the court finds substantial prejudice, then it must interrogate the

jury. *Id.* However, *Williamson* does not prohibit a court from deciding, as a precautionary measure, to question the jurors, even if the court has not concluded that there is substantial prejudice to the defendant. Absent a ruling from the court on the question of prejudice, it would seem incorrect for the ICA to infer that the court implicitly determined that there was substantial prejudice to the Petitioner. In any event, Petitioner does not appear to rely on the court's "implicit" finding of substantial prejudice in his Application.

ations. To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside.

100 Hawai'i at 365–66, 60 P.3d at 315–16 (quoting *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir.1998)) (emphasis added). Although Petitioner does not distinguish between the two forms of prejudice, he appears to be arguing that both "presumed" and "actual" prejudice are satisfied.

## 1.

With respect to presumed prejudice, this court has explained that there are three factors to consider in determining whether prejudice should be presumed:

> Among the factors to be considered in a presumed prejudice argument is *whether there was a barrage of inflammatory publicity immediately prior to trial amounting to a huge ... wave of public passion.* An additional factor is *whether the media accounts were primarily factual, as such accounts tend to be less prejudicial than inflammatory editorials or cartoons.* A final factor is *whether the media accounts contained inflammatory, prejudicial information that was not admissible at trial.*

*Pauline*, 100 Hawai'i at 366, 60 P.3d at 316 (quoting *Ainsworth*, 138 F.3d at 795 (citations and internal quotation marks omitted)) (emphases added). In addition to the three *Ainsworth* factors, this court examines the jury selection process to determine whether "the trial judge took sufficient steps to shield the proceedings from the prejudicial effect of the publicity." *Pauline*, 100 Hawai'i at 367, 60 P.3d at 317.

Petitioner is correct that it would have been better for the court to not give the publicity statement. By reading the statement to the venires, the court alerted even those jurors who were not aware of the publicity or who might have forgotten about it that the incident had been in the news and that some accounts portrayed Wilcox in a positive light. *See Okumura*, 78 Hawai'i at 394, 894 P.2d at 91 (explaining that questioning of juror about media accounts in front of other potential jurors risked tainting the jury pool). However, this does not mean that there was presumed or actual prejudice to Petitioner.

*Pauline* explained that trial courts should presume prejudice "only in 'extreme situations.' " 100 Hawai'i at 366, 60 P.3d at 316 (quoting *State v. Kauhi*, 86 Hawai'i 195, 200, 948 P.2d 1036, 1041 (1997)). This court clarified that "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Id.* (quoting *State v. Graham*, 70 Haw. 627, 636, 780 P.2d 1103, 1109 (1989) (quoting *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344, (1977))). For, "[i]f the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain [a] jury trial under the conditions of the present day." *Id.* (internal citation and quotation marks omitted).

Here, the court's reading of the publicity statement is not an "extreme" situation that warrants concluding that prejudice should be presumed. As to the first *Ainsworth* factor, the court's publicity statement does not amount to or suggest that there was a "huge wave of public passion" regarding Wilcox's death. Nor, as Petitioner suggests, did the court put its imprimatur on the characterization of Wilcox as a Good Samaritan. The court's statement was descriptive, stating only that it had been reported in the media that Wilcox had intervened in an argument between Petitioner and his wife and that Wilcox had been "described" as a Good Samaritan. These statements do not evince strong public passion.

With regard to the second *Ainsworth* factor (whether the accounts were primarily factual), the court's single-paragraph publicity statement was primarily factual. The court mentioned the date and location of the alleged offense, that Petitioner allegedly stabbed Wilcox after he intervened in an argument between Petitioner and his wife, and that both Petitioner and Wilcox had consumed alcohol. The only "non-factual" statement made by the court was that Wilcox had been described as a Good Samaritan. Thus, it is unlikely that the publicity statement prejudiced Petitioner.

As to the third *Ainsworth* factor (whether media accounts contained inflammatory information inadmissible at trial), again, the

only statement that would not have been admissible at trial was that Wilcox had been described as a Good Samaritan. A single statement to that effect, however, does not appear to be the kind of inflammatory statement that would render it impossible for jurors to keep an open mind.

In *Okumura*, this court considered whether the questioning of one juror before the rest of the jurors regarding certain news reports substantially prejudiced the defendants. 78 Hawai'i at 390, 394–96, 894 P.2d at 87, 91–93. The defendants in the case had been accused of two burglaries, and the juror had seen a newscast that included an interview of a person who alleged that he had been burglarized by the defendants. *Id.* The burglary in the newscast had not been charged in the case. *Id.*

When the trial court questioned the juror about the newscast, the juror stated that she might not be able to remain impartial because the uncharged burglary had taken place recently and its occurrence suggested to her that the defendants had committed the charged burglaries. *Id.* at 394–96, 894 P.2d at 91–93. This court concluded that the defendants had not been substantially prejudiced on account of the other jurors having heard this exchange because "no facts of the other alleged burglary were given, how [defendants] were implicated was not stated, and [the juror's] opinion ... was entirely equivocal." *Id.* at 396, 894 P.2d at 93. Moreover, the record of the voir dire indicated that the jury selected could consider the case impartially. *Id.*

Here, similarly, although the court risked tainting the jury by reading the publicity statement to all of the prospective jurors, it does not appear that Petitioner was prejudiced. In fact, the suggestion in *Okumura* that the defendants had committed the same crime on a previous occasion as the crime that was being charged had a greater potential for prejudice than the court's statement here, which was by and large a factual description of the offense charged. The court also expressed no opinion as to the correctness of the media reports. Finally, as discussed below, the court conducted extensive voir dire of those jurors who indicated a familiarity with media reports about the incident and struck those jurors who said that they could not be impartial. Consequently, Petitioner was not substantially prejudiced by the publicity statement.

2.

Petitioner also argues that although the court engaged in a thorough voir dire, "[this] does not mean that the jury was fair and impartial." In order to show actual prejudice, Petitioner "must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside." *Pauline*, 100 Hawai'i at 365, 60 P.3d at 315. Petitioner, however, does not point to anything in the proceedings that would suggest that any of the jurors who sat on the jury exhibited any partiality or hostility that could not be set aside. Petitioner's only contention appears to be that the court's publicity statement was prejudicial because five of the "eight or nine" jurors who remembered the media reports also recalled that the decedent had been described as a Good Samaritan. Petitioner does not explain, however, how the fact that those jurors remembered the press statements resulted in an inability to keep an open mind.

In fact, the five jurors referenced by Petitioner all stated in response to questioning by the court and by Petitioner that they could keep an open mind. Thus, in answer to the question whether he remembered "the good Samaritan feature [of the news cast]," Juror 16 responded that he recalled that aspect of the story but that he did not react strongly to it, and that he would be able to set all of the publicity aside and make his decision based on what he heard in court. The other four jurors testified similarly. Petitioner does not refer to anything in the record that would suggest that any jurors who exhibited bias were retained on the jury. Thus, the ICA did not err in concluding that the court identified and dismissed those jurors who exhibited bias by conducting a thorough voir dire.

VII.

Petitioner also contends that evidence was erroneously admitted during the sentencing phase of the trial.

### A.

Petitioner argues that the ICA erred in holding that he forfeited his contention that Kauilani's testimony concerning the April 3, 1996 domestic violence incident was inadmissible. According to Petitioner, Kauilani indicated that she was reading from the police report, and since there is no indication that the prosecution retrieved the police report, the testimony was inadmissible.

### 1.

Although Petitioner suggests that the ICA erred in concluding that the defense did not object, the record does not reveal any objections on the part of the defense with respect to Kauilani's testimony concerning the April 1996 incident. Thus, Petitioner is wrong to imply that he objected or that his failure to object had no effect. Petitioner's failure to object matters to the extent that this court will only notice the alleged error if it is plain and if it affected Petitioner's substantial rights. *Walsh*, 125 Hawai'i at 284, 260 P.3d at 363.

### 2.

▆▆▆ In any event, even assuming there was no forfeiture, the ICA correctly concluded that Kauilani's testimony was admissible. "When used to refresh [a] witness's present recollection, a writing is solely employed to jog the memory of the testifying witness." *State v. Dibenedetto*, 80 Hawai'i 138, 144, 906 P.2d 624, 630 (App.1995). If the writing does not refresh the witness's memory, the witness may not testify about or read the contents of the writing into evidence unless the writing is admitted under another rule of evidence. *State v. Espiritu*, 117 Hawai'i 127, 137, 176 P.3d 885, 895 (2008).

▆▆▆ Kauilani first testified that she could not remember the April 1996 incident because it had taken place many years earlier. However, when Respondent asked her whether her memory was refreshed by the police report, Kauilani answered in the affirmative.[19] Respondent continued to ask questions of Kauilani, and she testified that she and Respondent had argued on April 3, 1996, that Petitioner had slapped her on the face several times, grabbed her neck, threatened to kill her, and locked her in the apartment for about an hour. Petitioner implies that Kauilani could not remember these incidents by noting that the record does not reflect that Respondent ever took the police reports from her. However, there is nothing in the record to indicate that Kauilani's memory was not refreshed with respect to these allegations. As such, it was not improper for this testimony to come in under the "past recollection refreshed" exception.

### B.

▆▆▆ Petitioner also maintains that the ICA erred in holding that Kauilani's July 13, 1996 statement was admissible as past recollection recorded because Kauilani testified that her memory was not awakened by the report and the report should therefore not have been admitted as past recollection recorded. Hawai'i Rules of Evidence (HRE) Rule 802.1(4) defines past recollection recorded as follows:

(4) Past recollection recorded. A memorandum or record concerning a matter about which the witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

The commentary to HRE Rule 802.1 provides in pertinent part, "Paragraph (4): This paragraph is identical with Fed.R.Evid. 803(5), and it restates the common-law hearsay exception for recorded recollection, *see State v. Altergott*, 57 Haw. 492, 559 P.2d 728 (1977)."

---

19. Subsequently, Kauilani stated, "On the paper it says he slapped me[,]" in response to the question whether Petitioner had grabbed her to prevent her from leaving the apartment. Thus, the record might suggest, at least with respect to this question, that Kauilani was reading from the police report. On the other hand, it is possible that Kauilani was just stating that the report (which she had read previously when her recollection was being refreshed) stated that Petitioner slapped her. In any event, Petitioner, did not object.

As the ICA correctly reasoned, "[t]he commentary to Rule 803(5) of the Federal Rules of Evidence (FRE)[20] acknowledges that '[n]o attempt is made in the exception to spell out the method of establishing ... accuracy of the record, leaving them to be dealt with as the circumstances of the particular case might indicate.'" *Keohokapu*, 2011 WL 4426889 at *4. (footnote, brackets, and ellipsis in original). Commenting on FRE 803(5), M. Graham, Federal Practice and Procedure: Evidence § 7046 at 486–91 (interim ed. 2006) states the following as to establishing the accuracy of the record:

> A record or memorandum is admissible as an exception to the hearsay rule if the proponent can show that *the witness once had personal knowledge of the matter*, that *the record or memorandum was prepared or adopted by him when it was fresh in his memory*, that *it accurately reflected his knowledge*, and that *the witness currently has insufficient recollection to enable him to testify fully and accurately[.]* The witness may testify either that he remembers making an accurate recording of the event in question which he now no longer sufficiently remembers, that he routinely makes accurate records of this kind, or, if the witness has entirely forgotten the exact situation in which the recording was made, that he is confident from the circumstances that he would not have written or adopted such description of the facts unless that description truly described his observations at the time.

(Footnotes omitted.) (Emphases added.)

In *State v. Sua*, 92 Hawai'i 61, 75, 987 P.2d 959, 973 (1999), this court upheld the admission of a witness's statement as past recollection recorded where the witness, "wrote the statement himself, indicating that he 'once had knowledge' of the information contained therein[;] ... signed the statement, thereby adopting it as his own[;] ... the statement was made less than a month after the incident, [and] we may fairly infer that it was given when the events were still 'fresh [in the witness's] memory[ ]'[;] [and where the witness] testified at trial that he was unable to remember writing the statement." *See also Bloss*, 3 Haw.App. at 278, 649 P.2d at 1179 (concluding that past recollection was satisfied with respect to a traffic citation where the witness "[made the citation] when the matter was fresh in his memory, in fact contemporaneously, and [where the citation's contents] accurately reflected [the witness's] knowledge of the matter").

In this case, as the ICA correctly concluded, although Kauilani did not sign her July 13, 1996 statement under penalty of perjury, the statement satisfies the criteria for the past recollection recorded exception. Kauilani testified that she remembered the incident on July 13, or at least "the part with me," but that she could not remember the specific allegations of abuse that were described in the statement. She also testified that the statement was in her writing, contained her signature, and that she wrote the report the day following the incident. Thus, Respondent established that Kauilani had personal knowledge of the July 13 incident, that her statement was prepared when it was fresh in her memory (the day after the incident), that it accurately reflected her knowledge, and that she currently had insufficient recollection to testify fully and accurately. *See Sua*, 92 Hawai'i at 75, 987 P.2d at 973. The ICA was therefore correct that the July 13 statement was admissible as past recollection recorded.

Petitioner is wrong that Kauilani's testimony concerning her July 13 statement was not admissible because Kauilani testified that her memory was not awakened by the report. To the contrary, to satisfy the past recollection recorded exception, the witness must have "once had knowledge," but must "now ha[ve] insufficient recollection to enable the witness to testify fully and accurately." HRE Rule 802.1(4). Had Kauilani testified that she could recall the incidents in her statement, as Petitioner contends was necessary, her statement would not have been admissible under the exception of past recollection recorded. Therefore, the ICA did not err on account of the statement's failure to

---

**20.** FRE Rule 803(5) is identical to HRE Rule 802.1(4). *State v. Bloss*, 3 Haw.App. 274, 278, 649 P.2d 1176, 1179 (1982); *see also* commentary to HRE Rule 802.1(4). When the HRE rule is identical to a FRE rule, "we may refer to federal case law for assistance in construing our Rule." *State v. Jhun*, 83 Hawai'i 472, 478, 927 P.2d 1355, 1361 (1996) (brackets omitted).

reawaken Kauilani's memory. *Cf. Espiritu,* 117 Hawaiʻi at 136, 176 P.3d at 894 (concluding that police report did not qualify under past recollection recorded because the report was not shown to have been made by the witness when the matter was fresh in the witness's memory).

## VIII.

■ The ICA also concluded that it was error for the court to admit Balga's testimony because Respondent failed to establish the foundation that Balga made his statement when the matter was fresh in his memory and reflected his knowledge correctly. *See Keohokapu,* 2011 WL 4426889, at *5. Petitioner does not quarrel with that conclusion and Respondent did not file a writ application or a response to Petitioner's Application.[21]

Although Balga acknowledged that the signature and handwriting on the report were his, and it appears that the statement was made shortly after the incident, Balga also stated that he did not remember making the report because he had "been involved in alcohol and drugs for a long time ... [and] just got sober not even a year ago." He also testified that he could not remember an officer being in his apartment on the night of the incident. Because of his drinking problem, Balga could not recall making an accurate recording of the event and did not express any confidence in the accuracy of the statement attributed to him. As the ICA correctly found, Balga's alcohol and drug use cast doubt on the reliability of his statement, and there was no other evidence that buttressed Balga's account. *See Keohokapu,* 2011 WL 4426889, at *5. As such, Respondent did not establish that Balga once had personal knowledge of the matter described in the statement or that the statement accurately reflected Balga's knowledge at the time.

Respondent nevertheless maintains that *United States v. Porter,* 986 F.2d 1014, 1016 (6th Cir.1993), supports its position. In *Porter,* the defendant's girlfriend made a written statement to the police claiming the

defendant ordered her to dispose of cocaine and cash, but, at the defendant's trial, recanted, claiming that she could not remember making the statement because she was confused and on drugs at the time the statement was made. *Id.* The statement was read into evidence as past recollection recorded. *Id.* The Sixth Circuit Court of Appeals held that it was not error to admit the statement.

*Porter* is distinguishable from this case. The Sixth Circuit explained that the district court made a "very careful" analysis of the statements and found sufficient indicia of trustworthiness. *Id.* at 1017. As in this case, the statement of the witness in *Porter* contained the witness's signature and was apparently made shortly after the incident. *Id.* However, in *Porter,* unlike in this case, there were additional factors that established the trustworthiness of the statement. *Id.* The witness in *Porter* (1) admitted to making the statement; (2) signed the statement on each of its five pages; (3) changed the wording and initialed the changes eleven times; and, (4) made the statement under penalty of perjury. *Id.* The statement also contained considerable detail that was internally consistent, and it was consistent with other uncontradicted evidence that had already been admitted. *Id.* Further, the district court determined that the defendant's girlfriend was being evasive at trial and was recanting out of her recently professed desire to marry the defendant or out of fear of the defendant. *Id.* No analogous factors were found by the court in this case. *Porter,* therefore, does not assist Respondent. The ICA was thus correct in concluding that Balga's statement was admitted in error.

## IX.

Petitioner also maintains that the ICA was wrong in holding that there was no error in the court's jury instructions referencing parole. Relying on precedent from other jurisdictions, Petitioner asserts that the court's instruction to the jury during the sentencing

21. Consequently, the correctness of the ICA's ruling is not implicated in the instant writ. *See State v. Eid,* 126 Hawaiʻi 430, 447, 272 P.3d 1197, 1214 (2012) (Acoba, J., concurring) (noting that because Respondent neither filed an application for writ of certiorari from the judgment of the ICA nor a response to Petitioner's application the issues raised on appeal by Respondent were not implicated in the writ). However, because at oral argument Respondent contested the ICA's ruling on this issue, it is considered here in order to confirm and clarify the ICA's conclusion.

phase concerning the possibility that Petitioner might be paroled was likely to mislead and confuse the jury by inviting it to consider irrelevant matters, even if the instruction was technically correct.

## A.

Under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and its progeny, the trier of fact must find beyond a reasonable doubt any fact that increases the penalty for a crime beyond the prescribed statutory maximum. *State v. Maugaotega*, 115 Hawai'i 432, 442, 168 P.3d 562, 572 (2007) (reversing prior case law that adopted the then-majority view and explaining that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt); *State v. Jess*, 117 Hawai'i 381, 394, 184 P.3d 133, 146 (2008) ("[I]n light of *Cunningham*, except for prior convictions, multiple convictions, and admissions, 'any fact, *however labeled*, that serves as a basis for an extended term sentence must be proved beyond a reasonable doubt to the trier of fact.'") (citation omitted) (emphasis in original). The "statutory maximum" discussed in *Apprendi* is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant. *Blakely v. Washington*, 542 U.S. 296, 303–04, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

■ Since *Apprendi* only requires that juries find the *facts* that increase a defendant's sentence beyond the statutory maximum, in general, instructions about the length of the ensuing sentence or about the possibility that a defendant's sentence might be reduced through parole or commutation would be irrelevant. Thus, for example, under HRS § 706-656(2), the sentence for a

person convicted of murder in the second degree is life with the possibility of parole:

> (2) *Except as provided in section 706-657*, pertaining to enhanced sentence for second degree murder, *persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole*....

HRS § 706-656(2) (Emphasis added.) However, the court may increase the sentence of a person convicted of murder in the second degree to life without the possibility of parole under HRS § 706-657,[22] whereby life without the possibility of parole may be imposed if the *jury* finds as facts that the murder was especially heinous, atrocious, or cruel. This statute has been construed in a series of cases, the latest of which was *State v. Peralto*, 95 Hawai'i 1, 6, 18 P.3d 203, 208 (2001), in which this court held that the phrase "especially heinous, atrocious, or cruel, manifesting exceptional depravity" provided adequate notice of the conduct prohibited. *Peralto* did not say that the jury should be told that finding that the murder was especially heinous, atrocious, or cruel would result in an enhanced sentence. *Peralto*, however, stated that the sentencing jury should be "instructed according to *Young*." *Peralto*, 95 Hawai'i at 6, 18 P.3d at 208. *State v. Young*, 93 Hawai'i 224, 235, 999 P.2d 230, 241 (2000), in turn refers to *State v. Janto*, 92 Hawai'i 19, 986 P.2d 306 (1999). *Janto* described the bifurcated proceedings that should be used for guilt and sentencing:

> [T]he *court shall instruct the jury that it must determine whether the prosecution has proved, beyond a reasonable doubt, that the murder was "especially heinous, atrocious, or cruel."* The jury's finding must be unanimous in order for the court,

---

22. HRS § 706-657 provides:

§ 706-657. Enhanced sentence for second degree murder

*The court may sentence a person who has been convicted of murder in the second degree to life imprisonment without possibility of parole under section 706-656 if the court finds that the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity or that the person was previously convicted of the offense of murder in the first degree or murder in the second degree in this State or was previously*

*convicted in another jurisdiction of an offense that would constitute murder in the first degree or murder in the second degree in this State.* As used in this section, the phrase "especially heinous, atrocious, or cruel, manifesting exceptional depravity" means a conscienceless or pitiless crime which is unnecessarily torturous to a victim and "previously convicted" means a sentence imposed at the same time or a sentence previously imposed which has not been set aside, reversed, or vacated.
(Emphasis added.)

in the exercise of its sound discretion, to consider an enhanced sentence. The jury shall then conduct its deliberations and submit its findings in response to a special verdict form. If the jury does not come to a unanimous decision that the murder was "especially heinous, atrocious, or cruel" beyond a reasonable doubt, no enhanced sentence shall be imposed. Pursuant to the language of HRS § 706–657, *if the jury does find unanimously that the murder was "especially heinous, atrocious, or cruel" beyond a reasonable doubt, the court may, in its discretion, impose an enhanced sentence.*

*Id.* at 35, 986 P.2d at 322 (emphases added).

There is no suggestion in *Janto* that the jury should be instructed that if it finds that a murder was committed in an especially heinous, atrocious, or cruel manner, the maximum length of the defendant's sentence will increase from life with the possibility of parole to life without the possibility of parole. Likewise, there is no reason to so instruct the jury in the instant case. *Apprendi* is satisfied as long as the jury finds the relevant facts. Under HRS § 706–661, the jury does not determine the sentence—that is the province of the court, which may choose, in its discretion, not to impose an extended term.

## X.

■ In general, instructions that apprise the jury of the possibility of post-conviction actions of other government agencies are unnecessary, and should be avoided.[23] The California Supreme Court in *People v. Ramos,* 37 Cal.3d 136, 207 Cal.Rptr. 800, 689 P.2d 430, 441–44 (1984)[24], considered whether it was proper to instruct the jury on the governor's commutation power. In *Ramos,* the instruction at issue informed the jury that the governor could commute a sentence of life without parole, but did not inform the jury that the governor could also commute a sentence of death. *Id.* at 438–44. In addition to holding that the instruction was inaccurate, the *Ramos* court held that even if the instruction were accurate, it was inconsistent with the California Constitution. *Id.*

*Ramos* explained that instructions that permit a sentencing jury to consider a variety of postconviction actions by other governmental entities—parole, commutation, trial court review—were improper. *Id.* Consideration of postconviction actions was "inconsistent with the jury's proper decision-making role," given the speculative nature of the inquiry the instruction engenders, especially in light of the difficulty involved in attempting to predict what a particular defendant would be like in the future when parole or commutation may be considered. *Id.* The *Ramos* court cited twenty-five other jurisdictions that had reached similar conclusions, while acknowledging that three jurisdictions had reached the opposite result. *Id.* at 442 n. 10.

*Ramos* provided two reasons for concluding that it is improper to invite the jury to

23. The United States Supreme Court in *Simmons v. South Carolina,* 512 U.S. 154, 168–69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality), held that a capital defendant has a federal constitutional right to inform the sentencing jury about his or her parole *in* eligibility "if the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, [because] the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society." Justice O'Connor, concurring in the judgment, agreed that "[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, ... the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain' [requires that the defendant be afforded an opportunity to introduce evidence on this point]." *Id.* at 175, 114 S.Ct. 2187 (O'Connor, J., concurring) (citation omitted) (brackets and ellipsis in original). Justice O'Connor also stated that in a state in which parole is available, "the Constitution does not require (or preclude) jury consideration of that fact." *Id.* at 176, 114 S.Ct. 2187 (O'Connor, J., concurring). *Simmons* is not at issue here since this is not a capital case (and Hawai'i has no death penalty) and this case does not involve Petitioner's *in* eligibility for parole.

24. *Ramos* is still the law in California. *See People v. Beames,* 40 Cal.4th 907, 55 Cal.Rptr.3d 865, 153 P.3d 955, 972 (2007) ("Generally, reference to the commutation power is improper because it 'invites the jury to consider matters that are both totally speculative and that should not, in any event, influence the jury's determination.'") (citing *Ramos,* 37 Cal.3d 136, 207 Cal. Rptr. 800, 689 P.2d 430).

consider post-conviction actions. First, an instruction on the possibility of commutation (or parole) invites the jury to go beyond its proper role and attempt to "preempt" the executive's authority by imposing a sentence that will at least minimize the opportunity for commutation (or parole). *Id.* at 443. Second, such an instruction "may tend to diminish the jury's sense of responsibility for its action" because "[k]nowledge on the part of the jury ... may imply to a jury that if it mistakenly convicts an innocent man, or mistakenly fails to recommend mercy, the error may be corrected by others." [25] *Id.*

## XI.

In this case, HRS § 706–662 sets forth the facts the jury must find in order to authorize the court to increase the defendant's sentence beyond the statutory maximum for the offense of manslaughter. HRS § 706–662 was amended in 2007 "to ensure that the procedures used to impose extended terms of imprisonment comply with the requirements set forth by the United States Supreme Court and Hawa[i'i] [S]upreme [C]ourt." [26]

Commentary to HRS § 706–662. The legislature intended "that these amendments apply to any case that requires resentencing because of the decisions in the *Apprendi*, *Blakely*, *Booker*, *Cunningham*, and *Maugaotega* cases." *Id.*

The statutory scheme contemplates that the court and the jury will have distinct roles. The procedure for imposing extended terms of imprisonment, located in HRS § 706–664 (Supp.2008),[27] provides that if the jury (the trier of fact) finds the facts that are necessary for the imposition of an extended term sentence under HRS § 706–662, the court *may* impose an indeterminate term of imprisonment as provided in HRS § 706–661. HRS § 706–662 provides that a defendant "who has been convicted of a felony may be subject to an extended term of imprisonment under section 706–661 if it is proven beyond a reasonable doubt that an extended term of imprisonment is necessary for the protection of the public[,]" and if the defendant satisfies one or more of the other criteria listed therein. The sentencing terms or ranges are lo-

---

**25.** On the other hand, other jurisdictions have held that instructions on the meaning of parole are proper. One rationale is that a sentencing jury (or a jury that recommends a sentence to the judge) ought to be fully aware of the consequences of a sentence in order to make a determination as to which sentence is appropriate. *See Brewer v. State*, 275 Ind. 338, 417 N.E.2d 889, 908–09 (1981); *State v. Grisby*, 97 Wash.2d 493, 647 P.2d 6, 10 (1982) (holding that although juries should not be told about parole in general, when a statute requires the jury to decide between a sentence that includes parole and one that does not, the jury should be told about parole so that it can make an informed decision). However, as explained *infra*, since the jury here does not determine or recommend the length of the sentence, but "finds the facts necessary for the imposition of an extended term of imprisonment," HRS § 706–604, the *Brewer* rationale would not apply in this case.

**26.** The commentary to HRS § 706–662 states in relevant part:

After further consideration in light of the *Cunningham* case, the Hawaii supreme court issued an opinion in *State v. Maugaotega*, 115 Hawai'i 432, 168 P.3d 562 (2007), which held that statutes governing Hawaii's extended term sentencing are unconstitutional because they require a judge rather than a jury to find facts, other than those of prior or concurrent convictions, necessary to enhance a defendant's sentence beyond the ordinary or standard term

authorized by the jury's verdict.... The purpose of this Act is to amend Hawaii's extended term sentencing statutes to ensure that the procedures used to impose extended terms of imprisonment comply with the requirements set forth by the United States Supreme Court and Hawaii supreme court.

**27.** HRS § 706–664 (Supp.2008), which provides as follows:

**§ 706–664. Procedure for imposing extended terms of imprisonment.** (1) Hearings to determine the grounds for imposing extended terms of imprisonment may be initiated by the prosecutor or by the court on its own motion. The court shall not impose an extended term unless the ground therefor has been established at a hearing after the conviction of the defendant and written notice of the ground proposed was given to the defendant pursuant to subsection (2)....

(2) Notice of intention to seek an extended term of imprisonment under section 706–662 shall be given to the defendant within thirty days of the defendant's arraignment....

(3) *If the jury, or the court if the defendant has waived the right to a jury determination, finds that the facts necessary for the imposition of an extended term of imprisonment under section 706–662 have been proven beyond a reasonable doubt, the court may impose an indeterminate term of imprisonment as provided in section 706–661.*

cated in HRS § 706–661, which provides that "the *court may sentence* a person who satisfies the criteria for any of the categories set forth in section 706–662," to an extended term of imprisonment.[28] (Emphasis added.)

 The language of these statutes makes clear that jury is responsible only for determining whether the prosecution has proven beyond a reasonable doubt the *facts* necessary for the imposition of an extended term of imprisonment. HRS § 706–664; HRS § 706–662. The jury is *not* responsible for sentencing. That responsibility lies with the court, which "may," in its discretion, then sentence the defendant to an extended term of imprisonment as set forth in HRS § 706–661. In other words, even if the jury finds the facts that would warrant an extended term sentence, because HRS § 706–664 and HRS § 706–661 utilize the word "may," the court retains the discretion to not impose an extended term sentence. *See Gray v. Admin. Dir. of the Court,* 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997) ("[T]he close proximity of the contrasting verbs 'may' and 'shall' requires a *non-mandatory, i.e.,* a discretionary, construction of the term 'may.'") (emphasis in original).

(Emphasis added.)

28. Although the court *may* sentence a person who satisfies the criteria set forth in HRS § 706–661 to an extended term, "[w]hen ordering an extended term sentence, the court *shall* impose the maximum length of imprisonment." HRS § 706–661 (emphasis added).

29. The other factor Petitioner's jury had to find was that Petitioner had committed two or more felonies when he was eighteen years of age or older. Petitioner does not contest that this factor was satisfied.

30. Parole, however, is allowed because the sentence is "indeterminate." *See* Commentary on HRS § 706–659 ("This bill effects this purpose by denying suspension of sentence and probation as sentencing options in class A convictions, but retains, through indeterminate sentence, the option of parole by the paroling authority in order that unusual extenuating circumstances can be given due consideration.").

31. Thus, it was also improper to include references to parole and to the indeterminate nature of the terms in jury instructions nos. 3, 5, 6 and 7

 Nevertheless, for an extended term sentence to be imposed under HRS § 706–662, the jury must find that a longer term than the statutory maximum is necessary for the protection of the public. Under the statute the jury in effect must consider whether it is necessary, in order to protect the public, to incarcerate the defendant for a longer term than that which the defendant would otherwise serve. To make that determination, the jury must consider the maximum length of the two potential terms in an appropriate manner.[29]

 Manslaughter is a class A felony, *see* HRS § 707–702, and is punishable by an "indeterminate term of imprisonment of twenty years without the possibility of suspension of sentence or probation."[30] HRS § 706–659. If, however, the criteria for any of the categories set forth in HRS § 706–662 are satisfied, then the court may impose an indeterminate term of life imprisonment for a class A felony. HRS § 706–661. To determine whether an extended term of imprisonment is necessary for the protection of the public, however, the jury should not be instructed about the procedures of the Hawai'i Paroling Authority, or that the sentence includes the possibility of parole, for the reasons discussed *supra* and *infra.*[31] The jury

and in special interrogatory no. 2. Although Petitioner did not object to these in his Application, he recognized during oral argument that he should have objected. It would be inconsistent to conclude that jury instructions nos. 2 and 4 were admitted in error, but to hold that references to parole in jury instructions nos. 3, 5, 6, and 7 and in special interrogatory no. 2 were proper. As discussed, *infra,* the error in admitting jury instructions no. 2 and 4 was not harmless. Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) defines plain error as, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." We may "employ our HRPP Rule 52(b) discretion to correct errors that are not harmless beyond a reasonable doubt and to disregard those errors that are harmless beyond a reasonable doubt." *State v. Nichols,* 111 Hawai'i 327, 335, 141 P.3d 974, 982 (2006). "[T]he same standard of review is to be applied both in cases in which a timely objection to a jury instruction was made and those in which no timely objection was made." *Id.* In this case, in order to provide guidance to the court and to correct errors in the jury instructions that were not harmless beyond a reasonable doubt, we employ our discretion and notice that references to parole in jury instructions nos. 3, 5, 6, and 7

can make an intelligent determination as to whether it is necessary to incarcerate the defendant for an extended term to protect the public if instructed that the term will involve maximums of twenty years and life. Whether the defendant will ever be paroled is pure speculation since parole is dependent on circumstances in the future and is discretionary with the Hawai'i Paroling Authority.

Since the jury is only responsible for finding the facts that may result in an extended term sentence, there was no basis for asking the jury whether the prosecution had proven that it was necessary for the protection of the public to subject Petitioner to an "extended term of imprisonment, which could extend the maximum length of [Petitioner's] imprisonment for the offense of Manslaughter from twenty years of incarceration to life with the possibility of parole." Nor was it necessary to give the jury instructions on how the Hawai'i Paroling Authority sets the minimum prison term. The jury should instead have been instructed and asked whether it was necessary to extend Petitioner's sentence from a possible twenty year sentence to a possible life sentence for the protection of the public. Also, an interrogatory phrased in this manner would have been accurate and at the same time would not direct the jury's attention to the potential issues of parole.[32] This would be the appropriate way for the jury to consider the maximum length of the two potential terms.[33]

### XII.

■ As expressed by the *Ramos* court and other courts, a jury whose attention is drawn to the issue of parole might choose the harsher sentence for fear that the defendant will not serve the complete term of the more lenient sentence, or may not take its task seriously because it believes mistakes in sentencing can be corrected by the paroling agency. This would be improper and would frustrate the statutory scheme. In *Ramos*, the court explained that speculation as to parole was inappropriate, given the difficulty involved in attempting to predict what a particular defendant may be like in the future when parole or commutation may be considered. 689 P.2d at 441–44. Here, the risk of jury speculation that arises from instructing the jury about the sentence range and parole would engender even more questionable results because the court retains discretion to *not* impose an extended term sentence. HRS § 706–664; HRS § 706–661. In fact, the court itself recognized that the possibility of parole was not a proper factor for the jury to consider inasmuch as the court instructed the jury in instruction no. 5 that it should not consider the possibility of parole in reaching a verdict.

The ICA, however, concluded that jury instructions no. 2 and 4 were appropriate because they were accurate. But, as noted *supra*, courts have determined that even accurate instructions concerning parole can be injurious. Those courts have reasoned that the instruction still allows the jury to speculate regarding the future conduct of the defendant and actions of the parole board. *See, e.g., Ramos*, 207 Cal.Rptr. 800, 689 P.2d at 441–44.

The ICA also found no error in this case because the court explicitly instructed the jurors not to discuss or consider the subject of any action that the Hawai'i Paroling Authority may or may not take, and juries are

---

and in special interrogatory no. 2 were as improper as jury instructions nos. 2 and 4.

**32.** The jury also heard references to parole because Exhibit 10A showed that Petitioner had several parole violations, and Exhibit 6 contained the parole minutes of the Hawai'i Paroling Authority regarding those violations. Exhibit 6 and Exhibit 10A were admitted into evidence over Petitioner's objections. However, Petitioner has not appealed the propriety of the admission of those records into evidence. In any event, this matter need not be addressed inasmuch as we remand the case with respect to admission of Balga's statement in the police report and the extended sentencing hearing.

**33.** This case does not involve a choice between life with the possibility of parole and life without the possibility of parole, such as in the case of a motion for extended term for the offense of murder in the second degree pursuant to HRS § 706–661(1). *See* n. 6. *supra.* The court may impose an extended term of life without parole under HRS § 706–661(1) if the jury finds pursuant to HRS § 706–662 that an extended term is necessary for the protection of the public, as well as one or more of the factors specified under HRS § 706–662. A like instruction in such a case would be to instruct the jury to consider whether the defendant's sentence should be extended from possible life imprisonment to a definite (or fixed) sentence of life imprisonment.

generally presumed to follow the instructions of the court.[34] *See State v. Smith,* 91 Hawai'i 450, 461, 984 P.2d 1276, 1287 (App.1999). But the presumption that juries follow the instructions is not absolute. Thus, in *Smith,* although the ICA recognized the presumption that juries adhere to court instructions, it held that the prejudice to the defendant caused by improper comments on the part of the prosecution were not cured by court instructions advising the jury that remarks made by counsel were not evidence. *Id.* Similarly, in *State v. Kahinu,* 53 Haw. 536, 548, 498 P.2d 635, 643 (1972), this court held that a cautionary instruction may be insufficient to cure prejudice when the prosecution deliberately introduces irrelevant evidence resulting in an "evidential harpoon." *Kahinu* establishes that, in certain circumstances, a curative instruction may be insufficient to overcome the prejudice caused by an error. *Id.*

Here, a presumption that the jury followed the instruction of the court to not consider the actions of the parole board is not compelling because, by also instructing the jury regarding the actions of the parole board, the court effectively invited the jury to consider these actions in deciding whether the facts warranted an extended sentence. That is, the court informed the jury of the effect the parole board's decision would have on both an indeterminate twenty-year sentence subject to parole, and a sentence of life with the possibility of parole. If the jury was not to consider the actions of the parole board, the effect the parole board's actions might have with respect to the jury's decision should not have been set forth in the instructions. As one court put it, "[a] voluntary statement on the part of the trial court referring to the power of the Board of Pardons ... might make the jury believe that the statement has been made for the express purpose of calling such power to their attention and thus might have a tendency to influence them in their verdict." *State v. Carroll,* 52 Wyo. 29, 69 P.2d 542, 563 (1937).

Discussing parole with the jury also carried the risk that the jury would not appreciate the gravity of its duty, believing that its mistakes might be corrected by some other entity. *See Ramos,* 207 Cal.Rptr. 800, 689 P.2d at 443. Even assuming the jury had a "right to be informed regarding the available choices," as those jurisdictions that allow instructions regarding parole appear to hold, the instruction here would unnecessarily court error because, as the court recognized, the potential actions of the parole board should not enter into the jury's deliberations. Further, instructing the jury concerning parole and the role of the paroling authority while at the same time admonishing the jury not to consider parole and the role of the paroling authority is inconsistent and likely to confuse the jury. Finally, the matter of parole was simply a matter outside the scope of the jury's function, which is limited to finding the two operative facts under HRS § 706–662. *See State v. Prosser,* 186 S.W.3d 330, 331–33 (Mo.App.2005) ("issues such as parole ... are considered extraneous to the jury's determination of guilt and *punishment* ") (emphasis in original). As such, it was error for the court to instruct the jury on parole.

## XIII.

■■■ The next question is whether the errors in the admission of Kauilani's and Balga's testimony and in the jury instructions were harmless beyond a reasonable doubt.[35] *See State v. Veikoso,* 126 Hawai'i

---

34. As noted, *supra,* jury instruction no. 5 instructed the jury to "not discuss or consider the subject of any action that the Hawai'i Paroling Authority may or may not take in your deliberations of the facts at issue in this hearing." This would be an appropriate instruction to give if the jury were to inquire about parole. *See Beames,* 55 Cal.Rptr.3d 865, 153 P.3d at 972 ("[W]hen the jury makes a specific inquiry about how a post-conviction proceeding such as commutation might affect defendant's sentence, we have suggested that trial courts issue a short statement emphasizing that it would be a violation of the jury's duty to consider the possibility of commu-

tation in determining the appropriate sentence.") (internal quotation marks and citation omitted).

35. Petitioner argues that the harmless error doctrine does not apply to errors that take place during the sentencing phase. However, the harmless error doctrine does apply to errors implicating sentencing. *See State v. Rivera,* 106 Hawai'i 146, 165–66, 102 P.3d 1044, 1063–1064 (2004), overruled on other grounds by *Maugaotega,* 115 Hawai'i at 442–43, 168 P.3d at 572–73; *State v. Aplaca,* 96 Hawai'i 17, 25, 25 P.3d 792, 800 (2001) ("The fact that the error, in this case, implicates [defendant's] sentence and not his

114

267, 276, 270 P.3d 997, 1006 (2011) ("Regarding the erroneous admission of evidence by a trial court, this court has said that[, e]ven if the trial court erred in admitting evidence, a defendant's conviction will not be overturned if the error was harmless beyond a reasonable doubt[.]") (citation omitted) (internal brackets in original). When assessing whether an error is harmless, the question is whether, in light of the entire proceedings, there is "a reasonable possibility that [the] error might have contributed" to the verdict. *Id.* (internal quotation marks and citation omitted). The jury's first finding was that Petitioner committed two or more felonies since he turned 18. The court took judicial notice that Petitioner had committed four felonies. The felonies were unrelated to the testimony that was erroneously admitted or to the erroneous jury instructions concerning parole.[36] As such, it is unlikely that the erroneous testimony and jury instructions had any effect on the jury's determination that Respondent had proven beyond a reasonable doubt that Petitioner committed two or more felonies. However, there is a reasonably possibility that the erroneously admitted testimony and the jury instructions had an effect on the jury's consideration of whether an extended term of imprisonment was necessary for the protection of the public.

### A.

The improperly admitted testimony consisted of Kauilani's testimony concerning the incident of domestic abuse on October 1994, and Balga's testimony concerning the incident in October 1993. In addition to that testimony, the jury heard (properly admitted) testimony regarding incidents of domestic abuse on April 3, 1996, during which Petitioner injured and threatened to kill Kauilani; on July 13, 1996, during which Petitioner bit and head-butted Kauilani; on March 11, 2008, when Kauilani obtained a TRO because of incidents of domestic abuse in January 2008 and March 2008; and an incident on June 9, 2008, in which Officer Wong said he saw Petitioner hit the windshield of Kauilani's car with his fist and break the windshield wiper of the car as Kauilani attempted to leave. In light of this testimony, it is unlikely that the October 1994 incident had much of an impact on whether the jury believed that Petitioner had engaged in domestic abuse toward Kauilani on multiple occasions in the past.

The erroneous admission of Balga's testimony, however, is much more troubling. Other than the incident with which Petitioner was charged and the domestic violence incidents, Respondent's witnesses testified to only two incidents in which Petitioner was aggressive toward someone other than Kaui-

conviction does not render the harmless error doctrine inapplicable."); *Washington v. Recuenco*, 548 U.S. 212, 222, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (holding that error involving *Blakely v. Washington*, 542 U.S. at 303–04, 124 S.Ct. 2531, and the failure to submit a sentencing factor to a jury, like the failure to submit an element on an offense to the jury, is not structural error and is therefore subject to harmless error review); *see also United States v. Montgomery*, 635 F.3d 1074, 1092 (8th Cir.2011) ("Even if we conclude that the district court erred [in allowing jury to hear certain evidence during the penalty phase of a capital trial], we cannot reverse or vacate a federal death sentence on account of an error that is harmless beyond a reasonable doubt."). Petitioner's argument that the ICA could not consider whether the court's errors during sentence were harmless therefore is incorrect.

It should be noted that dissent's reasoning in *Rivera* that Hawai'i's intrinsic-extrinsic sentencing paradigm was inconsistent with *Blakely* was later sustained by *Maugaotega*. *Compare Rivera*,

106 Hawai'i at 173, 102 P.3d at 1071 (Acoba, J., dissenting, joined by Duffy, J.) (disagreeing with "the majority's rationale for distinguishing [the] 'intrinsic-extrinsic' paradigm from the implication's of *Blakely* "), *with Garcia v. State*, 125 Hawai'i 429, 263 P.3d 709 (2010) (explaining that, in *Rivera*, a majority of this court held that, under the intrinsic-extrinsic distinction, facts which exposed a defendant to an extended prison term sentence were not required to be submitted to the jury, but that, in *Maugaotega*, a majority of this court acknowledged that, in light of *Cunningham v. California*, 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007), except for prior convictions, multiple convictions, and admissions, any fact that serves as a basis for an extended term sentence must be proved beyond a reasonable doubt to the trier of fact)

36. Again, the felonies were burglary in the first degree, robbery in the second degree, promoting a dangerous drug in the third degree, and unlawful use of drug paraphernalia. It appears that Kauilani's and Balga's testimony had nothing to do with these offenses.

lani—the Balga incident, and a second incident in which Petitioner injured a man during the commission of a robbery in 1994. It is reasonably possible that a jury could have concluded that the incidents involving Kauilani alone were not enough to find that an extended term of imprisonment was necessary to protect the public. It is also reasonably possible that, without Balga's testimony, testimony alluding to only one other incident, dating back to 1994, eleven to twelve years before Petitioner allegedly committed the charged offense, would not have been enough to cause the jury to find that the extended term was necessary. Thus, the admission of Balga's testimony was not harmless beyond a reasonable doubt.

### B.

As to the erroneous inclusion of parole in the jury instructions and interrogatories nos. 2 and 4, erroneous jury instructions are presumed to be harmful and will result in reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. *State v. Mark*, 123 Hawai'i 205, 219, 231 P.3d 478, 492 (2010). It does not "affirmatively" appear from the record that the instructions were harmless. The jury may have decided that it was necessary to incarcerate Petitioner for a longer term because it sought to prevent Petitioner from being paroled for as long as possible. The jury may also have believed that any errors with respect to the extended term sentence would be corrected by the Hawai'i Paroling Authority. This would be improper because it would undermine the statutory scheme that entrusts decisions concerning parole to the executive branch. Whether Petitioner could be paroled in the future was plainly not relevant to the jury's consideration of whether an extended term sentence was necessary for the protection of the public. If parole is highlighted in the jury instructions, as it was here, it is reasonable to infer that the jury might consider it. As noted, the instruction to disregard parole was rendered confusing and inconsistent with the other five instructions given by the court with respect to parole. Under the circumstances, then, it does not affirmatively appear from the record that the jury might not have considered the potential actions of the

Hawai'i Paroling Authority in its deliberations. Thus, it is reasonably possible that the effect of the jury instruction errors contributed to the jury verdict on the extended term motion and was therefore not harmless. Further, given that there were both evidentiary errors and jury instruction errors, it is also reasonably possible that the cumulative effect of these errors contributed to the jury verdict. *See State v. Pemberton*, 71 Haw. 466, 473, 796 P.2d 80, 84 (1990) (holding that the cumulative weight of errors was harmful); *State v. Amorin*, 58 Haw. 623, 626, 574 P.2d 895, 900 (1978) (same).

### XIV.

Accordingly, we vacate the October 6, 2011 judgment of the ICA in part as to the harmlessness of the evidentiary error involving the admission of Balga's police report statement and as to Petitioner's extended term sentence, and affirm the ICA's judgment in all other respects. We vacate the June 22, 2009 judgment of conviction and sentence of the court in part as to the same matters, affirm the said judgment in all other respects, and remand to the court for proceedings consistent with this opinion.

Concurring and Dissenting Opinion by
RECKTENWALD, C.J., in which
NAKAYAMA, J., Joins.

This case requires us to consider how juries should be instructed under Hawaii's recently-amended extended sentencing law. That law now requires a jury to determine, inter alia, whether an extended term prison sentence is necessary for the protection of the public. *See* Hawai'i Revised Statutes (HRS) §§ 706–661 (Supp.2008), 706–662 (Supp.2008), and 706–664 (Supp.2008). Previously, that was an issue for a judge to determine; however, in the wake of a series of U.S. Supreme Court cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the legislature in 2007 amended the statute to assign this task to a jury, unless waived by the defendant. *See* 2007 Haw. Sess. Laws, Second Special Sess., Act 1, §§ 1–4 at 1–4.

In the instant case, defendant Glenn Keohokapu, Jr. was convicted of manslaughter for stabbing Steven Wilcox to death outside a

bar, and thus faced a possible twenty year indeterminate sentence. HRS §§ 707–702 [1] and 706–659.[2] However, the State sought to extend his sentence to a term of life with the possibility of parole, and accordingly the jury was asked to consider whether Keohokapu was a persistent offender,[3] and whether an extended term sentence was needed to protect the public. HRS § 706–661(1). As set forth below, there was ample evidence establishing that Keohokapu was a persistent offender, and that Wilcox's death was one of a number of violent or otherwise criminal acts committed by Keohokapu during his adult life.

The circuit court accurately instructed the jury that the applicable sentencing options were a twenty year indeterminate term of imprisonment, or an extended term of life with the possibility of parole, and also gave the jury accurate definitions of "indeterminate term of imprisonment" and "parole." In my view, that information was required so that the jury could perform its role—as mandated by HRS § 706–662—to determine whether the extended term was necessary for the protection of the public.

The majority suggests that the jury should have instead been instructed that the applicable sentencing options were "maximums of twenty years and life[,]" e.g., without any reference to parole. Majority Opinion at 681. Respectfully, I disagree with that approach on several grounds. First, it is contrary to the statutory extended term sentencing scheme, which requires the jury to determine whether "an extended term of imprisonment is necessary for the protection of the public." See HRS §§ 706–662 and 706–664. Absent accurate information about the applicable sentencing options, the jury cannot fulfill its role under the statute. See HRS § 706–661.

Second, the majority's approach has the potential to confuse the jury about the applicable extended term. A jury could reasonably infer that a sentence of "life" means that the defendant will remain imprisoned for the remainder of his or her life. However, that inference would not necessarily be accurate, since a defendant such as Keohokapu would be eligible for parole.

Finally, the majority's approach does not account for the fact that in certain cases, the statute requires the jury to determine whether a defendant should be subjected to an extended sentence of life without parole, rather than a sentence of life with the possibility of parole. See HRS § 706–661(1) (providing that the maximum length of an extended term of imprisonment for murder in the second degree, which carries a sentence of life imprisonment with the possibility of parole, shall be "life without the possibility of parole"). There is no way that a jury could meaningfully make that decision without being informed of the difference between life with, and life without, the possibility of parole. Thus, the legislature clearly contemplated that juries would not be shielded from the fact that parole is available.

The circuit court here went further and included additional information about how the parole process works, including the setting of minimum terms. While I believe that this additional information was not required by the statute, any error in giving it was harmless in light of the overwhelming evidence in the record supporting the need for an extended term sentence to protect the public. Similarly, any error in the admission of evidence at the extended term sentencing hearing was harmless beyond a reasonable doubt.

Accordingly, I would affirm Keohokapu's conviction for manslaughter [4] and the extend-

---

1. HRS § 707–702(3) (Supp.2008) provides, "Manslaughter is a class A felony."

2. HRS § 706–659 (Supp.2008) provides in pertinent part that "a person who has been convicted of a class A felony ... shall be sentenced to an indeterminate term of imprisonment of twenty years without possibility of suspension of sentence or probation."

3. HRS § 706–662(1) (Supp.2008) defines "persistent offender" as a defendant who has "previ-

ously been convicted of two or more felonies committed at different times when the defendant was eighteen years of age or older."

4. I concur with the majority's holding that the process by which the jury was selected did not result in substantial prejudice to Keohokapu, notwithstanding the pretrial publicity. Majority opinion at 662–63 Thus, that issue is not discussed further herein.

ed term sentence imposed by the circuit court.

## I. Background

Keohokapu was charged with murder in the second degree, pursuant to HRS §§ 707–701.5 (1993) and 706–656 (Supp.2008), in connection with an incident on the night of June 7, 2008, in which he fatally stabbed Wilcox during a fight outside of a nightclub.

### A. Trial

In brief summary, the evidence a trial showed the following. On June 7, 2008, Wilcox and his friend Robin Gregory were at the nightclub Komo Mai. Keohokapu, Keohokapu's wife (Kauilani), and Keohokapu's brother were also at that nightclub. At some point in the evening, Keohokapu became upset after Wilcox's friend Gregory allegedly stared at Kauilani. Keohokapu left the club and Kauilani followed him outside, attempting to calm him down. Keohokapu's brother later joined the two of them outside. During their conversation, Keohokapu's brother "push[ed]" Kauilani away from the car. According to Kauilani, in response to seeing her being pushed, Wilcox, who had exited the club, said, "that's one female." Keohokapu's brother believed that Wilcox made that statement because Wilcox was trying to intervene in the situation. Thereafter, Keohokapu's brother told Wilcox that "it doesn't concern you[,]" and Keohokapu told Wilcox "that's my wife."

Several witnesses testified that Wilcox then began to fight with Keohokapu. Attempts were made to break up the fight between Wilcox and Keohokapu and calm the two men down. One witness recalled seeing a knife, held by Keohokapu, enter Wilcox's stomach. Keohokapu attempted to get into Kauilani's car, but she initially did not open the door because she was in shock and did not want to open the door until Keohokapu dropped the knife. Keohokapu left the scene with Kauilani. Wilcox was taken to the hospital where he died as a result of the stab wound.

Keohokapu testified in his own defense. He testified that, as the altercation began, Wilcox removed brass knuckles from his pocket, which caused Keohokapu to reach for a knife he had in his car because he was "worried." Keohokapu told Wilcox, "I going poke you[,]" but Wilcox continued to approach Keohokapu. Keohokapu testified that Wilcox eventually "walk[ed] into" the knife while Keohokapu was dodging Wilcox's punch. In closing argument, defense counsel argued that Keohokapu acted in self-defense.

The jury found Keohokapu guilty of the included offense of manslaughter, in violation of HRS § 707–702.

### B. Sentencing Proceeding

Prior to Keohokapu's sentencing, the State notified Keohokapu that he was eligible to be sentenced to an extended term of imprisonment as a persistent offender pursuant to HRS §§ 706–661 (Supp.2008) and 706–662(1) (Supp.2008). The State also notified Keohokapu that it intended to introduce evidence of his past crimes. On May 27, 2009, the sentencing phase of Keohokapu's trial began before the same jury that had found him guilty of manslaughter. The court instructed the jury that the purpose of the hearing was to determine whether Keohokapu may be subject to an extended term of imprisonment for the manslaughter offense.

Pursuant to a subpoena, Kauilani testified for the State. The DPA asked Kauilani about an incident that occurred on April 3, 1996, which led Kauilani to file a police report. On that date, Kauilani returned to the apartment she was sharing with Keohokapu, who was her boyfriend at the time, to retrieve her belongings in order to move back with her mother. The next day, Kauilani reported to the police that Keohokapu hit her. When Kauilani could not remember further details of the encounter, the DPA showed her the relevant police report. When asked whether the report refreshed her recollection, Kauilani answered in the affirmative.[5] The DPA then asked Kauilani whether Keohokapu grabbed her, to which

---

5. It is unclear whether the DPA retrieved the police report from Kauilani, but the record reflects that the DPA approached Kauilani before

asking her whether the report refreshed her recollection.

Kauilani responded, "On the paper it says he slapped me." Kauilani then proceeded to testify in greater detail that Keohokapu slapped her in the face a few times, pushed her, grabbed her neck, said "I like kill you" and "you're going to die," and locked her in a room.

The DPA then asked Kauilani about an incident that occurred on July 13, 1996. Kauilani and Keohokapu were still dating, but were not living together. Keohokapu arranged to go to Kauilani's house to talk to her. Kauilani testified that Keohokapu came to see her because he missed her, thought she was seeing someone else, and had someone else's jacket. After Keohokapu arrived, Kauilani wanted to leave, but Keohokapu pulled her hair and ears, hit her, head butted her, scratched her chest, and bit her in the eye and on her shoulder. Kauilani reported the abuse as "[a]buse of family and household member[.]"

The DPA then asked Kauilani about another incident that occurred on October 20, 1994. Kauilani testified that on that day, Keohokapu grabbed her, causing her to hit her head against a brick wall, bit her, and pulled her stomach. Defense counsel then requested a bench conference and asked the DPA whether Kauilani was testifying with the police report in front of her. The DPA responded that she did not know. The DPA then asked Kauilani about her testimony regarding the July 1996 and October 1994 incidents, and Kauilani stated, "I told you this is a part of my life that I tried to forget. And yes, I'm reading it from the paper."

The DPA then asked Kauilani about the police report for the July 13, 1996 incident. Kauilani testified that she signed the report, and wrote it the day following the incident. Kauilani testified that the report refreshed her recollection. However, when asked if she remembered her "hair being pulled" and being "head butted[,]" Kauilani responded "No[,]" "[t]his is back in '96." Over defense counsel's objection, the circuit court moved the report into evidence as a past recollection recorded. The report was then read to the

jury, and its contents were consistent with Kauilani's prior testimony.

The DPA proceeded to examine Kauilani with respect to her report of the October 20, 1994 incident, but then withdrew her questions and did not attempt to move the report into evidence.

Kauilani further testified that she took out an order for protection against Keohokapu on March 11, 2008, because he was "run[ning] around with [other] girls" and smoking, and she wanted to get her car back. When asked whether Keohokapu physically abused her in January 2008, Kauilani responded, "Only because I wanted to grab my keys, and I didn't want him to take the car. So I went for my keys. And he kept pushing me away." Kauilani testified that Keohokapu "ended up" cutting the middle of her eye with his teeth, choking her, and slapping her because she wouldn't move away from the door. She could not remember whether he forced her to have sex. Kauilani testified that she did not recall an incident of abuse on March 9, 2008. However, upon refreshing her recollection with the petition for an order for protection, Kauilani testified that, on March 9, 2008, Keohokapu grabbed her, pushed her, pulled her hair, choked her neck, and verbally abused her. However, she again testified that the purpose of the order for protection was to get her car back.

The DPA then asked Kauilani about a violation of the order for protection that occurred on April 23, 2008.[6] Kauilani explained that Keohokapu was "hurt" because she was going to the mainland to care for a cousin with Down Syndrome. Kauilani denied that she was leaving Hawai'i in order to get away from Keohokapu. The DPA then confronted Kauilani with her petition for an order for protection, in which Kauilani stated that she needed the order to protect herself until she could move out of state with her mother. Kauilani testified that she left for the mainland on April 24, 2008 and did not return until June 3, 2008, or four days before the incident at club Komo Mai.

---

6. Kauilani testified over the course of two days. Kauilani gave the following testimony on the second day, March 28, 2009.

The State then called Gregory Balga as a witness regarding an incident that occurred on October 23, 1993. Balga met Keohokapu in the early 1990's but could not recall what occurred on October 23, 1993. Specifically, Balga testified, "I have a drinking problem and I believe I was drinking." The DPA showed Balga his statement to the police concerning the incident. Balga testified that the statement was in his writing and bore his signature, but did not refresh his recollection regarding what occurred. Balga did not recall making a statement or talking to a police officer. The statement was admitted over objection as a past recollection recorded and was read to the jury. In the statement, Balga indicated that Keohokapu had accused him of "fooling around with his chick" and had kicked Balga in the face and hit Balga's sister. On cross-examination, Balga stated that he could not say whether the information he had written in his statement was accurate.

In addition, the following testimony was adduced from various witnesses. A Honolulu Police Department (HPD) officer testified that he arrested Keohokapu for robbery on December 18, 1994, and that Keohokapu had injured the complaining witness's mouth, jaw, and chin area, and had bitten the witness's arm. Another HPD officer testified that he arrested Keohokapu in connection with a homicide case on June 9, 2008,[7] and that, upon arriving at Keohokapu's home, he witnessed Keohokapu jump on a woman's car, break off one of the windshield wipers, and attempt to break the windshield with his fist. During the testimony of a representative of the Hawai'i Criminal Justice Data Center, a criminal history record for Keohokapu was admitted into evidence, which showed twenty convictions. An HPD fingerprint examiner testified that Keohokapu's prints matched the prints taken for several police reports. Four of the police reports were associated with felony charges, i.e., burglary in the first degree, robbery in the second degree, promoting dangerous drugs in the third degree, and unlawful use of drug paraphernalia. Another HPD officer testified that he executed a search warrant at Keohokapu's home on December 6, 2002 and found a pipe and several bags of a substance resembling crystal methamphetamine.

After the State rested, the defense moved for judgment of acquittal, which was denied. Keohokapu presented testimony of his mother, sister, and father, which showed that Keohokapu was abused as a child. For example, Keohokapu's mother testified that from ages six to seventeen, Keohokapu's father would punch Keohokapu in the face or chest. When asked about whether she had spoken to Keohokapu since the homicide, his mother responded affirmatively and testified that Keohokapu had "expressed regret" for what happened. Keohokapu's father admitted being an "abusive father" and felt "responsible for what happened because of the way [he] raised him." Keohokapu did not testify.

During the settling of jury instructions, defense counsel objected to the circuit court's proposed jury instructions numbers 2 and 4, concerning parole. Defense counsel explained that the instructions "might lead a jury to speculate that sentences imposed would result in shorter sentences that for whatever reason a jury might feel the need to over-compensate by extending—by voting to extend a sentence." The State argued that the instructions were appropriate because the jury "need[s] to know what it is that they are—that they are answering." The circuit court indicated that it would give the instructions over defense counsel's objection.

The jury was instructed that, for the offense of manslaughter, Keohokapu "may be subject to a maximum indeterminate term of imprisonment of twenty years."[8] The jury was further instructed that it would be required to answer two special interrogatories, contained in jury instruction number 1, in pertinent part:

1. Has the prosecution proven beyond a reasonable doubt that [Keohokapu] is a persistent offender in that he has previously been convicted of two or more felonies

---

7. It appears that the HPD officer was testifying about the instant case and that the female inside the car was Kauilani.

8. This instruction appeared in jury instruction number 7.

committed at different times when he was eighteen years of age or older?

2. Has the prosecution proven beyond a reasonable doubt that it is necessary for the protection of the public to subject [Keohokapu] to an extended term of imprisonment, which would extend the maximum length of his imprisonment for the offense of Manslaughter from twenty years of incarceration to life with the possibility of parole?

The jury was read the following instructions concerning parole:

[Jury Instruction No. 6] An "indeterminate term of imprisonment" is a sentence to imprisonment for the maximum period defined by law, subject to termination at any time after service of the minimum term of imprisonment determined by the Hawaii Paroling Authority.

[Jury Instruction No. 2] When a person has been sentenced to a term of imprisonment, the Hawaii Paroling Authority shall, as soon as practicable but no later than six months after commitment to the custody of the Director of the Department of Public Safety hold a hearing, and on the basis of the hearing make an order fixing the minimum term of imprisonment to be served before the prisoner shall become eligible for parole.

The Paroling Authority in its discretion may, in any particular case and at any time, impose a special condition that the prisoner will not be considered for parole unless and until the prisoner has a record of continuous exemplary behavior.

After sixty days notice to the prosecuting attorney, the authority in its discretion may reduce the minimum term fixed by its order.

[Jury Instruction No. 3] "Parole" means a conditional release of a prisoner who has served part of the term for which he was sentenced to prison.

[Jury Instruction No. 4] The following provision of law relates to "parole", as defined in these instructions:

No parole shall be granted unless it appears to the Hawaii Paroling Authority that there is a reasonable possibility that the prisoner concerned will live and remain at liberty without violating the law and that the prisoner's release is not incompatible with the welfare and safety of society.

[Jury Instruction No. 5] You must not discuss or consider the subject of any action that the Hawaii Paroling Authority may or may not take in your deliberations of the facts at issue in this hearing.

During its closing argument, the State argued that in determining whether an extended term of imprisonment was necessary for the protection of the public, the jury should consider "the time frame of these incidents" and "the fact that there are no signs of rehabilitation." The State pointed out that the first incident occurred on October 23, 1993 and involved Balga, while the second incident was in 1996 and involved another felony, robbery in the second degree. The State further pointed to multiple incidents in 1996 that involved Kauilani and highlighted violations and crimes that occurred when Keohokapu was not in prison. In conclusion, the State argued:

[Keohokapu], even after the death of [ ] Wilcox is not concerned about his own safety, safety of others, safety of the person who's driving the car or anybody else that's on the road because he's angry.

When he's angry and he gets violent and he cannot control himself.

And when he gets angry and he gets violent and he cannot control himself, it results in injuries to other people, and now it has escalated into a death of a person.

And because of that, the State is asking you to find that the extended term of imprisonment is necessary for the safety of the public.

In closing, defense counsel argued, inter alia:

[T]he starting point is Manslaughter. Manslaughter is to be punished by 20 years. The life lost in a manslaughter case is to be repaid by 20 years. You cannot punish [Keohokapu] by unanimously saying yes to a life sentence and you cannot make [Keohokapu] repay the loss of [Wilcox's] life by exacting the price of a life sentence.

You can only vote yes to a life sentence for [Keohokapu] if the State has proved to

you beyond a reasonable doubt that it is necessary for the protection of the public that he be subjected to an extended term of imprisonment amounting to life.

In its rebuttal, the State argued that "from the first incident until the death of [ ] Wilcox in June, 2008, the time that [Keohokapu] spent in society [was] about five years[,]" even though the time period spanned over "16 or so years[.]" The State emphasized that in those "five years, [Keohokapu] managed to get three felony convictions, two of them which had injuries, a drug charge, methamphetamine charge, two abuse convictions, a restraining order conviction where the restraining order was based on two other physical abuse cases[,]" prior to causing Wilcox's death.

The jury found that the State had met its burden of proving that Keohokapu was a persistent offender and that an extended term of imprisonment was necessary for the protection of the public. The circuit court sentenced Keohokapu to an extended term of imprisonment for life, with the possibility of parole.

## II. Discussion

Given recent changes in the statutory framework for extended term sentencing, the circuit court properly instructed the jury that the applicable sentencing options were a twenty year indeterminate term of imprisonment, or an extended term of life with the possibility of parole, and also properly gave the jury accurate definitions of "indeterminate term of imprisonment" and "parole." Thus, I respectfully disagree with the majority's holdings that those instructions constituted reversible error. Although the circuit court gave the jury unnecessary additional information about the parole process in instructions 2 and 4, those instructions were harmless in light of the entire record, which included overwhelming competent evidence that supported the conclusion that an extended term sentence was necessary for the protection of the public. For the same reason, I believe that the alleged evidentiary errors were also harmless.

Prior to 2007, Hawaii's extended term sentencing statutes required, inter alia, that the sentencing judge—not the jury—determine that an extended term of imprisonment was necessary for the protection of the public. See HRS §§ 706–661 (Supp.2007) and 706–662 (Supp.2007); see also State v. Maugaotega, 115 Hawai'i 432, 446–47, 168 P.3d 562, 576–77 (2007) (recognizing that HRS § 706–662 "in all of its manifestations, authorizes the sentencing court to extend a defendant's sentence beyond the 'standard term' authorized solely by the jury's verdict [ ] by requiring the sentencing court, rather than the trier of fact, to make an additional necessity finding ") (emphasis added).

In 2000, in Apprendi, the United States Supreme Court ruled that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. In light of Apprendi, several states amended their extended term sentencing procedures. Nevertheless, this court, relying on the distinction between intrinsic and extrinsic sentencing factors, initially maintained that Hawaii's extended term sentencing statute comported with Apprendi. See, e.g., State v. Kaua, 102 Hawai'i 1, 10–13, 72 P.3d 473, 482–85 (2003). However, in 2007, in Cunningham v. California, 549 U.S. 270, 291 n. 14, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007), the United States Supreme Court rejected the intrinsic/extrinsic distinction. Subsequently, in Maugaotega, this court expressly held that Hawaii's extended term sentencing statutes were unconstitutional. 115 Hawai'i at 477–48, 168 P.3d at 576–77. Thereafter, the legislature amended Hawaii's extended term sentencing statutes, HRS §§ 706–661, 706–662, and 706–664, to comport with, inter alia, Apprendi, Cunningham, and Maugaotega. See 2007 Haw. Sess. Laws, Second Special Sess., Act 1, § 1 at 2 ("The purpose of this Act is to amend Hawaii's extended term sentencing statutes to ensure that the procedures used to impose extended terms of imprisonment comply with the requirements set forth by the United States Supreme Court and Hawaii supreme court."). Thus, the statute governing extended terms of imprisonment, HRS § 706–661, was amended to read as follows:

**Extended terms of imprisonment.** The court may sentence a person who satisfies the criteria for any of the categories set

forth in section 706–662 to an extended term of imprisonment, which shall have a maximum length as follows:

(1) For murder in the second degree-life without the possibility of parole;

(2) For a class A felony-indeterminate life term of imprisonment;

(3) For a class B felony-indeterminate twenty-year term of imprisonment; and

(4) For a class C felony-indeterminate ten-year term of imprisonment.

When ordering an extended term sentence, the court shall impose the maximum length of imprisonment. The minimum length of imprisonment for an extended term sentence under paragraphs (2), (3), and (4) shall be determined by the Hawaii paroling authority in accordance with section 706–669.

HRS § 706–661 (Supp.2008).

The statute governing the criteria for extended terms of imprisonment, HRS § 706–662, was amended to require that the criteria for extended terms of imprisonment be "proven beyond a reasonable doubt":

**Criteria for extended terms of imprisonment.** A defendant who has been convicted of a felony may be subject to an extended term of imprisonment under section 706–661 if *it is proven beyond a reasonable doubt* that an extended term of imprisonment is necessary for the protection of the public and that the convicted defendant satisfies one or more of the following criteria:

(1) The defendant is a persistent offender in that the defendant has previously been convicted of two or more felonies committed at different times when the defendant was eighteen years of age or older[.]

HRS § 706–662 (Supp.2008) (emphasis added).

Significantly, the procedure for imposing extended terms of imprisonment under HRS § 706–664 was amended to incorporate a

jury in the process of determining whether the grounds for imposing an extended term of imprisonment have been established:

**Procedure for imposing extended terms of imprisonment.**

(1) Hearings to determine the grounds for imposing extended terms of imprisonment may be initiated by the prosecutor or by the court on its own motion. *The court shall not impose an extended term unless the ground therefor has been established at a hearing* after the conviction of the defendant and written notice of the ground proposed was given to the defendant pursuant to subsection (2). Subject to the provisions of section 706–604, *the defendant shall have the right to hear and controvert the evidence against the defendant and to offer evidence upon the issue before a jury;* provided that the defendant may waive the right to a jury determination under this subsection, in which case the determination shall be made by the court.

. . . .

(3) *If the jury,* or the court if the defendant has waived the right to a jury determination, *finds that the facts necessary for the imposition of an extended term of imprisonment under section 706–662 have been proven beyond a reasonable doubt,* the court may impose an indeterminate term of imprisonment as provided in section 706–661.

HRS § 706–664 (Supp.2008) (emphasis added).

Thus, absent a waiver by the defendant, the jury now determines whether "the facts necessary for the imposition of an extended term of imprisonment under section 706–662 have been proven beyond a reasonable doubt[.]" *Id.* While the jury is not responsible for sentencing, the jury must now determine whether the prosecution has proven beyond a reasonable doubt that, inter alia, an "extended term of imprisonment is necessary for the protection of the public[.]"[9] HRS § 706–662.

---

**9.** I respectfully disagree with the majority that the Hawai‘i cases it relies on, *State v. Peralto*, 95 Hawai‘i 1, 18 P.3d 203 (2001), *State v. Young*, 93 Hawai‘i 224, 999 P.2d 230 (2000), and *State v. Janto*, 92 Hawai‘i 19, 986 P.2d 306 (1999), are relevant to the inquiry before this court. *See* Majority opinion at 677–78. Those cases address the framework for enhancing a defendant's sen-

tence for second degree murder pursuant to HRS § 706–657 if "the murder was especially heinous, atrocious, or cruel[.]" *See Peralto*, 95 Hawai‘i at 6, 18 P.3d at 208; *Young*, 93 Hawai‘i at 234–36, 999 P.2d at 240–42; *Janto*, 92 Hawai‘i at 34–35, 986 P.2d at 321–22. Asking a jury to consider whether a murder was "especially hei-

In connection with that inquiry, the circuit court accurately instructed the jury that for the offense of manslaughter, Keohokapu "may be sentenced to a maximum indeterminate term of imprisonment of twenty years." *See* HRS §§ 707–702(3) and 706–659. Also in accordance with legislative directive, *see* HRS §§ 706–661, 706–662, 706–664, the circuit court instructed the jury that it must answer the following two interrogatories:

1. Has the prosecution proven beyond a reasonable doubt that [Keohokapu] is a persistent offender in that he has previously been convicted of two or more felonies committed at different times when he was eighteen years of age or older?

2. Has the prosecution proven beyond a reasonable doubt that it is necessary for the protection of the public to subject [Keohokapu] to an extended term of imprisonment, which would extend the maximum length of his imprisonment for the offense of Manslaughter from twenty years of incarceration to life with the possibility of parole?

In addition, the circuit court provided the jury with accurate definitions of "indeterminate term of imprisonment" and "parole." All of these instructions were necessary for the jury to meaningfully perform its role prescribed by the legislature, *see* HRS § 706–662, since they enabled the jury to consider the maximum lengths of the two potential terms so that it could determine whether an extended term was necessary for the protection of the public.

The majority, however, suggests that the jury should have instead been instructed only that the applicable sentencing options were "maximums of twenty years and life[,]" i.e., without any reference to parole. Majority opinion at 681. I respectfully disagree with that approach on several grounds. First, it is contrary to the extended term sentencing scheme in this jurisdiction. As amended, the extended term sentencing statutes explicitly

require the jury to determine whether "an extended term of imprisonment is necessary for the protection of the public," *see* HRS §§ 706–662 and 706–664, and explicitly recognize that the applicable "extended term" for Keohokapu is "an indeterminate life term of imprisonment[.]" *See* HRS § 706–661(1). Based on the plain language of the statutes, it is clear that the legislature intended that the jury determine whether a term of life with the possibility of parole was necessary for the protection of the public.

Second, the majority's approach has the potential to confuse the jury about the applicable extended term. Respectfully, I do not believe that excluding references to "parole," where parole is statutorily a part of the extended term, results in an accurate description of the maximum length of the extended term. Majority opinion at 681–82. An interrogatory phrased in the manner suggested by the majority could lead a jury to reasonably infer that a sentence of "life" means exactly what it says, e.g., that the defendant will remain imprisoned for the remainder of his or her life. However, that inference would not necessarily be accurate, because a defendant such as Keohokapu would be eligible for parole.

Finally, the majority's approach does not account for the fact that in certain cases, the statute requires the jury to determine whether a defendant should be subjected to a sentence of life without parole, rather than a sentence of life with the possibility of parole. For example, a defendant who is convicted of murder in the second degree, absent an enhanced sentence, "shall be sentenced to life imprisonment with possibility of parole." HRS 706–656(2). If that defendant is eligible for an extended term of imprisonment, pursuant to HRS § 706–661(1), the maximum length of the relevant extended term of imprisonment for "murder in the second degree" is "life without the possibility of pa-

nous, atrocious, or cruel" for the purposes of enhancing a defendant's sentence, *see Janto*, 92 Hawai'i at 35, 986 P.2d at 322, does not involve the same considerations as asking the jury to determine whether "an *extended* term of imprisonment is necessary for the protection of the public[.]" HRS § 706–662 (emphasis added). The latter requires reference to the statutory

maximum in order for the jury to determine whether a longer term is necessary for the protection of the public. In contrast, the former is a narrow inquiry that does not require any reference to the maximum length of the defendant's sentence. Accordingly, *Janto, Peralto,* and *Young* are inapposite.

**124**

role." In that situation, a jury could not meaningfully make the decision of whether an extended term of imprisonment is necessary for the protection of the public without being informed of the difference between life with, and life without, the possibility of parole.[10] The fact that the legislature explicitly requires the consideration of those two options confirms that in the present circumstances, it intended for the option of life with the possibility of parole to be explained to the jury.

The majority cites a number of cases that stand for the general proposition that juries should not be instructed about the possibility of parole. In particular, the majority relies on *People v. Ramos*, 37 Cal.3d 136, 207 Cal. Rptr. 800, 689 P.2d 430 (1984), in support of its position that instructions concerning the possible postconviction actions of other government agencies should be avoided. *See* Majority opinion at 677–79. I agree that considerations regarding sentencing should not play a role in the jury's deliberations on the guilt or innocence of a defendant, where extended sentencing is not at issue. However, this is not such a situation. As discussed *supra*, in response to *Apprendi* and its progeny, the legislature amended the extended term sentencing statutes to *require* the jury's involvement in issues of extended term sentencing, and in particular, to determine whether a specific extended term sentence was necessary for the protection of the public. *See* 2007 Haw. Sess. Laws, Second Special Sess. Act 1, §§ 1–4 at 1–4. Pursuant to Hawaii's sentencing scheme, the jury should be advised of what the applicable sentences

would be, and given definitions of the terms that appear in those sentences. Accordingly, I respectfully disagree with the majority that the circuit court erred by so instructing the jury in the instant case.

The circuit court here went further and included additional information about how the parole process works. More specifically, jury instructions 2 and 4,[11] to which Keohokapu objected, told the jury about how the Hawai'i Paroling Authority sets the minimum prison term, and that the Hawai'i Paroling Authority determines whether parole shall be granted. While I believe that this additional information was not required by statute, any error in giving it was harmless in light of the overwhelming evidence in the record supporting the need for an extended term sentence to protect the public. Similarly, any error in admitting Balga's report or Kauilani's testimony about her October 1994 statement to police was harmless beyond a reasonable doubt.

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, "when read and considered as a whole, the instructions given [were] prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Nichols*, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006). The alleged errors are "not to be viewed in isolation and considered purely in the abstract[,]" but rather "examined in the light of the entire proceedings and given the effect which the whole record shows [them] to be entitled." *Id.* I do not believe that jury instructions 2 and 4, while arguably irrele-

10. The majority suggests that in that situation, i.e., one involving a motion for extended term for the offense of murder in the second degree, the court should "instruct the jury to consider whether the defendant's sentence should be extended from possible life imprisonment to a definite (or fixed) sentence of life imprisonment." Majority opinion at 681 n. 33. Respectfully, this proposed language appears contrary to legislative intent, as the plain language of HRS § 706–661(1) states that the extended term of imprisonment for murder in the second degree is "life without the possibility of parole[,]" not "a definite (or fixed) sentence of life imprisonment." Majority opinion at 681 n. 33.

11. Jury Instruction No. 2 stated:
When a person has been sentenced to a term of imprisonment, the Hawaii Paroling Authority

shall, as soon as practicable but no later than six months after commitment to the custody of the Director of the Department of Public Safety hold a hearing, and on the basis of the hearing make an order fixing the minimum term of imprisonment to be served before the prisoner shall become eligible for parole.
. . . .
Jury Instruction No. 4 stated:
The following provision of law relate [sic] to "parole", as defined in these instructions:
No parole shall be granted unless it appears to the Hawaii Paroling Authority that there is a reasonable probability that the prisoner concerned will live and remain at liberty without violating the law and that the prisoner's release is not incompatible with the welfare and safety of society.

vant, were "prejudicially insufficient, erroneous, inconsistent, or misleading." *Id.* In light of the circuit court's proper instruction to the jury on what it was required to determine, and the overwhelming evidence adduced in support of the extended term sentence, there is no reasonable possibility that the alleged errors might have contributed to the jury verdict on the extended term motion.

Although jury instructions 2 and 4 arguably contained irrelevant information, that information was nevertheless accurate. Moreover, the circuit court specifically told the jury, as contained in jury instruction 5, "You must not discuss or consider the subject of any action that the Hawaii Paroling Authority may or may not take in your deliberations of the facts at issue in this hearing." This instruction was given immediately after the contested instructions concerning the Hawai'i Paroling Authority, and juries are presumed to have followed the court's instructions. *State v. Smith*, 91 Hawai'i 450, 461, 984 P.2d 1276, 1287 (App.1999). Thus, this instruction clarified to the jury that its function was not to deliberate over issues of parole. Rather, the jury's function was to determine whether the prosecution had proven beyond a reasonable doubt that, inter alia, an extended term of imprisonment was necessary for the protection of the public.

The record contains overwhelming competent evidence of Keohokapu's criminal history. This evidence included repeated acts of domestic violence against Kauilani, who reluctantly testified or indicated in police reports that Keohokapu, inter alia, hit her, slapped her, bit her, choked her, and threatened to kill her. Keohokapu's actions caused Kauilani to suffer bite marks, scratches, bruises, and hearing impairment. Multiple incidents occurred in 1996, and the jury heard testimony that over a decade later in 2008, Kauilani continued to allege in police reports acts of abuse and filed several orders for protection. Moreover, based on the testimony presented at trial, the jury was aware that the altercation between Keohokapu and Wilcox arose when Wilcox attempted to intervene in an argument involving Kauilani and Keohokapu.

In addition, the jury heard testimony from a police officer that in 1994, Keohokapu was arrested for robbery in the second degree, and the officer observed injuries to the complaining witness's mouth and jaw area, chin area, and to his right tricep area. The jury was also aware that Keohokapu was involved in the following four felony offenses: burglary in the first degree, robbery in the second degree, promoting a dangerous drug in the third degree, and unlawful use of drug paraphernalia.

Moreover, an officer testified that on June 9, 2008, the day after the incident resulting in Wilcox's death, the officer went to Keohokapu's house to arrest him in connection with the homicide case. The officer observed a female exiting the house and a male, later identified as Keohokapu, jumping on the front hood of the car. The officer could see that Keohokapu was "trying to smash the window in and he was holding on to what appeared to be the windshield wipers, which [he thought Keohokapu] broke off at a later point, and started hitting the car with it." The officer further testified that Keohokapu broke off the driver's side windshield wiper and "started banging the window and the car with it." Based on what he observed, the officer's impression was that Keohokapu was attempting to get into the car.

Finally, Keohokapu's history of criminal conduct was particularly of concern since, although it spanned a period of sixteen years, Keohokapu had been out of custody for only five of those years. Moreover, although he had been incarcerated for a substantial period in the middle of those sixteen years, he resumed his prior criminal behavior when he was released.

Based on the overwhelming competent evidence admitted at the sentencing phase, there is no reasonable possibility that jury instructions 2 and 4 prejudiced Keohokapu. In light of the entire record, I believe that any evidentiary and instructional errors were harmless beyond a reasonable doubt. Accordingly, I respectfully dissent from the majority's holding that Keohokapu's extended term sentence must be vacated, and I would affirm Keohokapu's extended term sentence.