IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>JESSE CHRISTIAN ENGERSETH,<br><br>Appellant. | No. 82997-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, J. — Jesse Engerseth appeals his convictions for murder in the second degree and vehicular homicide, as well as the sentence imposed. Engerseth assigns error to the trial court's admission of an out-of-court statement as a recorded recollection under ER 803(a)(5), and asserts the court failed to properly consider the potentially mitigating factors of youthfulness at sentencing. Finding no abuse of discretion in either the trial court's decision to admit the recorded recollection, or its imposition of a standard range sentence after considering Engerseth's youth, we affirm the convictions and sentence.

FACTS

On June 27, 2019, Jesse Engerseth parked his car outside the residence of Michael Smith and Ashley McGinley in Everett. Smith asked Engerseth to leave with his passengers, but he refused. Smith went back inside the residence, retrieved a power drill, and pushed it into the driver's door of Engerseth's car. Engerseth claimed he thought the object in Smith's hand was a gun and drove

away.  On the following day, June 28, Engerseth and Smith had another encounter behind a store where Engerseth had been napping in his car.  Engerseth later testified he felt threatened by that interaction, and that he returned to Smith's home that night and threw a metal car jack at Smith's car.  After investigating the noise caused by the car jack incident, Smith grabbed a stick from their home and left it in his car, telling McGinley that he knew who had done it.

About 30 minutes after throwing the car jack, Engerseth returned to an area near Smith's residence.  Shortly thereafter, Engerseth's passenger alerted him that Smith's car was coming towards them.  Engerseth later testified that Smith parked his car, opened the driver's door, and grabbed something off of the floorboard of his car.  Engerseth said he was frightened and quickly started his car before turning his wheel hard to the left to avoid Smith's vehicle.  Engerseth testified that one of the last things he remembered was accelerating and hearing a thud as Smith swung a "baseball bat" at his car.  Subsequently, the passenger told Engerseth he had struck Smith with his car, but Engerseth stated he "was in denial" at the time and did not stop driving.  As a result of the collision, Smith suffered multiple severe injuries including blunt force trauma to his head, which led to his death.

Engerseth went to Brooke Wilson's house after the incident.  Wilson recalled Engerseth was "really upset and frantic and said he had got into an accident and that he was really scared."  Sometime between 3:20 a.m. and 4:00 a.m. on June 29, police officers contacted Wilson.  She provided a written statement of her encounter with Engerseth.  Engerseth was arrested and charged with murder in the second degree, and vehicular homicide.  He proceeded to trial

and testified in his own defense, claiming that he neither intended to scare nor hit Smith. According to Engerseth, he "just wanted to get the hell out of there" because he was scared of Smith.

Wilson's written police statement was ultimately read to the jury as a recorded recollection. At trial, Wilson was unable to recall writing the statement as she had been under the influence of methamphetamine when she provided it to police. In proceedings outside the presence of the jury, Wilson was shown the statement and confirmed it was in her handwriting and contained her signature on both pages. Wilson further noted the biographical information and email address on her statement were accurate. She also reviewed the penalty-of-perjury language included in the statement, which she attested to understanding.

The jury found Engerseth guilty on both counts. Based on his offender score, the standard range sentence was determined to be 123-220 months for murder in the second degree, and 15-20 months for vehicular homicide. Engerseth requested an exceptional downward sentence of 60 months. He urged the court to consider the potentially mitigating factors of youth in supporting a downward departure from the standard range. While the court acknowledged its discretion to impose a sentence below the standard range, and considered the 22-year-old defendant's youthfulness as a possible mitigating circumstance, the judge determined the mitigation evidence did not warrant an exceptional sentence. Accordingly, the court imposed a standard range sentence of 147 months for murder in the second degree and 17 months for vehicular homicide.

Engerseth timely appealed.

<u>ANALYSIS</u>

I.    Admission of Recorded Recollection

Engerseth first assigns error to the trial court's decision admitting Wilson's written statement as a recorded recollection.  He argues the statement was not admissible because it failed to meet the reliability requirements of ER 803(a)(5).  The State responds that the trial court's decision to admit Wilson's statement was not error because it was based on tenable grounds and supported by substantial evidence.

We review evidentiary decisions, including the admission of statements under ER 803(a)(5), for an abuse of discretion.  <u>State v. Alvarado</u>, 89 Wn. App. 543, 548, 949 P.2d 831 (1998).  An abuse of discretion occurs "when the trial court's decision is manifestly unreasonable or based on untenable grounds or reasons."  <u>State v. Gonzales</u>, 1 Wn. App. 2d 809, 819, 408 P.3d 376 (2017).  "A recorded statement given to police is inadmissible hearsay unless it qualifies for an exception to the hearsay rule."  <u>State v. Nava</u>, 177 Wn. App. 272, 290, 311 P.3d 83 (2013).  The exception for a "recorded recollection" is defined as:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

ER 803(a)(5).

For the evidence to be admissible under ER 803(a)(5), the following four factors must be satisfied:

> (1) the record pertains to a matter about which the witness once had knowledge; (2) the witness has an insufficient recollection of the matter to provide truthful and accurate trial testimony; (3) the record was made or adopted by the witness when the matter was fresh in the witness' memory; and (4) the record reflects the witness' prior knowledge accurately.

Alvarado, 89 Wn. App. at 548 (citing State v. Mathes, 47 Wn. App. 863, 867-68, 737 P.2d 700 (1987)). The proponent of the evidence has the burden to establish these foundational factors by a preponderance of the evidence. Nava, 177 Wn. App. at 289-90. "The trial court's preliminary finding," as to whether the required evidentiary foundation has been established, "will be upheld if supported by substantial evidence." State v. Benn, 120 Wn.2d 631, 653, 845 P.2d 289 (1993). Substantial evidence is a "sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

The first three foundational factors of ER 803(a)(5) are plainly supported by substantial evidence. First, Wilson's written statement addresses her experience with Engerseth on the night of the incident. The statement shows that, at the time it was written, Wilson attested to personal knowledge of her interaction with Engerseth, and recalled what he had told her about hitting a man with his car. Second, Wilson testified that she only vaguely recalled the incident with Engerseth and, at the time of trial, her memory of the event was poor because she was "under a lot of narcotics at the time." While Wilson remembered Engerseth coming up to her on the night of the incident and telling her that he was scared, she could not remember writing the statement for police or the substance of what he said to her about the incident. Third, Engerseth hit Smith with his car on June 28, 2019, and

Wilson's written statement is dated June 29, 2019. Wilson confirmed on the record that the date on her statement reflected it was written the "day after"[1] she saw Engerseth. Accordingly, this establishes she wrote the statement while the interaction with Engerseth was fresh in her memory.

The fourth factor requires deeper analysis. As ER 803(a)(5) provides no specific method to establish the accuracy of the witness's prior knowledge, courts examine the totality of the circumstances. Alvarado, 89 Wn. App. at 551. The pertinent considerations include:

> (1) whether the witness disavows accuracy; (2) whether the witness averred accuracy at the time of making the statement; (3) whether the recording process is reliable; and (4) whether other indicia of reliability establish the trustworthiness of the statement.

Id. at 552. A recorded recollection may still be shown to accurately reflect the witness's knowledge "without the witness'[s] direct averment of accuracy at trial." Id. at 551. If other reliable evidence shows that a statement accurately reflects the witness's prior knowledge, and the court articulates a reason, supported by the record, for not believing the present disavowal, a recorded statement may still be admissible even after a declarant directly disavows it. Nava, 177 Wn. App. at 294-95.

Here, the trial court engaged in the proper analysis to determine whether Wilson's statement was admissible as a recorded recollection. First, the judge noted Wilson did not specifically disavow the accuracy of the statement. While Wilson testified that she would be concerned as to the accuracy of her statement, she confirmed there was "absolutely" no other reason for this concern besides her

---

[1] Wilson's statement was given to police officers in the early morning hours of June 29.

intoxication at the time the statement was written and subsequent lack of memory. The trial court stated that those considerations were "material for cross-examination and may be gone into significantly." Essentially, the jury could consider those factors when making credibility determinations and deciding what weight to give the statement.

Second, the trial court found that Wilson conceded the authenticity of the statement, based on her testimony that she recognized her handwriting and signature on both pages. Further, Wilson's signatures were "below the declaration portion on each of the two pages declaring facts contained in the two pages as true." Although Wilson also testified that the phone number listed on the statement was incorrect, she confirmed the information regarding her date of birth, height, weight, and email was accurate. She also verified her understanding of the penalty-of-perjury language above her signature at the bottom of each page. Third, because Wilson testified this was her own handwriting, the trial court found the recording process reliable, explaining, "she wrote it out in her own hand, so whatever she wrote, it's accurate as to how she wrote it." Finally, the court concluded the surrounding circumstances indicated the statement was generally trustworthy, based in large part on testimony of one of the officers who noted that they did not observe signs of impairment during their contact with Wilson. That officer specifically said that Wilson appeared to be in control of her person, understood why she was being contacted, was able to answer questions, and her responses to the questions were appropriate.

Engerseth argues Wilson's statement was unreliable due to her methamphetamine use, which affected her memory. He provides a number of articles in briefing regarding the impact of methamphetamine use on memory function, but no such studies were presented to the trial court. Further, he appears to aver that Wilson's methamphetamine use at the time of the incident impacted her ability to comprehend or recall what Engerseth purportedly conveyed to her that night, such that the content of her statement is unreliable, and does not focus on her ability at trial to recall the events.

Engerseth urges this court to follow State v. Keohokapu as persuasive authority for considering the admissibility of recorded recollections made by those with substance abuse problems. 127 Haw. 91, 107, 276 P.3d 660 (2012). However, the case is factually distinguishable and unpersuasive here. In Keohokapu, the State called a declarant to testify at sentencing about an incident which took place over a decade before the offense. Id. at 97-98. The declarant testified he had a drinking problem generally, and that he had been drinking heavily on the night in question and could not remember whether the defendant had come to his house. Id. at 97. The State showed the declarant the police report he had filed concerning the incident, but he could not recall what happened. Id. at 97-98. While he identified his handwriting and signature, as well as the date and time on the report, he did not remember writing it. Id. The declarant was also unable to remember an officer coming to his apartment on the night of the incident, and "there was no other evidence that buttressed [his] account." Id. at 107.

Accordingly, the court held the statement failed to meet the reliability requirements for a recorded recollection and was admitted in error. Id.

While both Wilson and the declarant in Keohokapu struggled with substance abuse at the time of their respective statements to police, and later memory deficits, the circumstances of their written statements are distinct. Unlike the declarant in Keohokapu, who could not recall seeing either a police officer or the defendant on the night of the incident, Wilson testified she remembered seeing both Engerseth and the officers shortly after the incident. Further, unlike the evidence supporting Wilson's statement, including the testimony of two officers who stated she did not appear impaired when they questioned her, there was no other evidence supporting the Keohokapu declarant's record of the alleged incident which occurred over a decade prior.

Our case law supports the trial court's decision to admit Wilson's recorded recollection even though she could not remember writing it. In In Re Detention of Peterson, Division Two of this court explained the distinction between the accuracy of the recorded recollection generally and the credibility of the witness's statement itself. 197 Wn. App. 722, 728, 389 P.3d 780 (2017). Importantly, "a record can be considered accurate for the purposes under ER 803(a)(5) even when a witness's credibility is clearly questionable." Id. at 729 (citing Alvarado, 89 Wn. App at 552-53). Accordingly, a witness's lack of memory surrounding a written statement goes "to the weight of their statements, not their admissibility." Nava, 177 Wn. App. at 297.

For example, in State v. Derouin, the witness provided a written statement to police, but she testified at the trial that she could remember neither writing the statement nor anything about the alleged incident. 116 Wn. App. 38, 41, 64 P.3d 35 (2003). Considering the totality of the circumstances, we held the recorded recollection was sufficiently reliable and should have been admitted under ER 803(a)(5). Id. at 46-47. Similarly, in State v. White, we found no error in the trial court's admission of a recorded recollection from a witness who was "too intoxicated" to recall whether the record accurately reflected what she had told police. 152 Wn. App. 173, 185, 215 P.3d 251 (2009). Following the reasoning in White, we decline to hold that Wilson's statement is unreliable simply because she was using methamphetamine at the time.

The trial court's decision to admit Wilson's statement as a recorded recollection was not based on untenable grounds and was supported by substantial evidence. Accordingly, we find no error.

A. Harmless Error Analysis

Engerseth avers Wilson's statement was critical evidence to establish intent, and without it, the outcome of his trial could have been different. The State points to substantial evidence, beyond Wilson's statement, that supports a finding by the jury as to the intent element of the charges, and argues that, "within reasonable probabilities, the trial's outcome would not have differed had the statement from Ms. Wilson not been read to the jury." Even if we were to assume that the trial court erred in admitting Wilson's statement, any such error would have been harmless.

"An error in admitting evidence that does not result in prejudice to the defendant is not grounds for reversal." State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). When a trial court ruling violates a constitutional mandate, the reviewing court applies the rigorous "harmless beyond a reasonable doubt" test to determine whether reversal is warranted. Id. at 403. However, here, where the evidentiary error does not constitute constitutional error, we apply the less-stringent standard "that error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981). "The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." Bourgeois, 133 Wn.2d at 403.

Based on the charging document, for count 1, murder in the second degree, the State was required to prove that Engerseth intended to commit an assault in the second degree against Smith and, in furtherance of that crime or flight therefrom, he caused Smith's death. Even without Wilson's recorded recollection, the other evidence adduced at trial demonstrates that the outcome of this trial would not have been materially affected.

Engerseth testified that, after hitting Smith with his car, he heard a "thud," and that his passenger told him that Smith had been hit. Another witness testified Engerseth drove his car into Smith, which resulted in what sounded like a car crash. Engerseth neither stopped nor called 911. Instead, he drove to a street near Wilson's house, left his car, went into Wilson's residence, and put on a mask

to conceal his face. Further, after he was arrested, Engerseth agreed to speak with officers and gave multiple conflicting accounts of the events. Initially, his story was limited to one interaction between himself and Smith, which concluded when, Engerseth asserted, Smith put a gun up to his car. Next, Engerseth acknowledged throwing the car jack and subsequently being approached by Smith, but he claimed that a second car had hit Smith. Later, he alleged not knowing whether he hit Smith with his car, then claimed it was an accident, and ultimately asserted it was self-defense. The State avers this evidence demonstrates Engerseth's consciousness of guilt.

The series of escalating encounters between Engerseth and Smith evinces intent. The first ended with Smith grabbing a drill, which Engerseth thought was a gun, and pushing it against Engerseth's car door. In a store parking lot the following day, Smith revved his engine and glared at Engerseth, who testified that he felt, "Threatened, like [he] wasn't safe anywhere." In response, Engerseth told law enforcement he decided to "send a message" to Smith by returning to Smith's residence and throwing a car jack at Smith's car. Engerseth stated he knew Smith would be looking for him that night. In fact, Smith did come looking for Engerseth and was ultimately run over and died from his injuries.

Further, the testimony of expert witnesses supports a finding of Engerseth's intent. Based on Smith's injuries, the medical examiner opined that he was struck from the right side and possibly the back. A forensic scientist from the Washington State Patrol Crime Lab testified that the tire impressions from both Engerseth's car and Smith's pants were consistent with a tire rolling over someone's leg. A jury

could reasonably conclude that this testimony supports a finding of intentional assault, plainly contradicting Engerseth's story of trying to escape from an attacker and unknowingly or accidentally hitting Smith.

Considering the evidence of Engerseth's intent to commit an assault, Wilson's written statement was of minor significance, and within reasonable probabilities, the outcome of this trial would not have changed had the recorded recollection not been admitted.

II.      Consideration of Youthfulness at Sentencing

Engerseth next asserts the court failed to properly consider his "reduced culpability as an emerging adult" at sentencing. Specifically, Engerseth argues the sentencing court abused its discretion by not meaningfully considering youthfulness as a possible mitigating factor.

We review a sentencing court's decision for a "clear abuse of discretion or misapplication of the law." State v. Porter, 133 Wn.2d 177, 181, 942 P.2d 974 (1997). An abuse of discretion occurs when the trial court's exercise of discretion is "'manifestly unreasonable or based upon untenable grounds or reasons.'" State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002) (quoting State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).

When faced with a discretionary sentencing decision, the trial court "must meaningfully consider the [defendant's] request in accordance with the applicable law." State v. McFarland, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017). The State properly notes in briefing that a sentence within the standard range may not be appealed. RCW 9.94A.585(1). However, "this rule does not preclude a defendant

from challenging on appeal the underlying legal determinations by which the sentencing court reaches its decision." McFarland, 189 Wn.2d at 56. When a defendant appeals such underlying legal determinations, our "review is limited to circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence." State v. Garcia-Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). The trial court errs when it: (1) fails to actually consider an exceptional sentence, (2) "refuses categorically to impose an exceptional sentence below the standard range under any circumstances," or (3) "operates under the 'mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence.'" Id. at 330; McFarland, 189 Wn.2d at 56 (quoting In re Pers. Restraint of Mulholland, 161 Wn.2d 322, 333, 166 P.3d 677 (2007)).

In State v. O'Dell, our Supreme Court addressed whether a defendant's youthfulness could justify an exceptional sentence below the standard range if the defendant was over 18 when the offense was committed. 183 Wn.2d 680, 689-97, 358 P.3d 359 (2015). Less than two weeks after O'Dell turned 18, he had sex with a 12-year-old girl, which led to his conviction for rape of a child in the second degree. Id. at 683-84. At sentencing, O'Dell requested an exceptional sentence below the standard range, raising his youthfulness as a mitigating circumstance. Id. at 685. However, the trial court ruled that it "could not" consider youth as a mitigating circumstance for a downward departure under the Sentencing Reform Act (SRA).[2] Id. at 685-86.

---

[2] Ch. 9.94A RCW.

Upon review, our Supreme Court remanded for a new sentencing hearing, concluding the trial court incorrectly ruled that it "could not" consider a defendant's youth at sentencing and thus failed to meaningfully consider O'Dell's youth as a possible mitigating factor. Id. at 689. The Court held that "a trial court must be allowed to consider youth as a mitigating factor when imposing a sentence on an offender like O'Dell, who committed his offense just a few days after he turned 18." Id. at 696. While youth can amount to a "substantial and compelling factor, in particular cases," the Court explained, "age is not a per se mitigating factor automatically entitling every youthful defendant to an exceptional sentence." Id. at 695-96.

Engerseth was convicted of count 1, murder in the second degree, and count 2, vehicular homicide. Based on Engerseth's offender score, these offenses carried standard range sentences of 123-220 months and 15-20 months respectively. While the State recommended a high-end sentence of 220 months for count 1 and 20 months for count 2, Engerseth requested an exceptional downward sentence of 60 months.

At the sentencing hearing, the trial court acknowledged its discretion in deciding whether Engerseth's sentence should be within the standard range. The judge expressly stated:

> The [c]ourt also has authority to take other factors into consideration and go outside the standard range sentence. Youthfulness of the offender is one such factor as are other factors which, based on various facts surrounding convictions, can distinguish the blameworthiness of a particular defendant's conduct from that normally present in that particular crime.

Further, the court noted its careful consideration of Engerseth's mitigation evidence and stated, "I have the discretion based on Dr. Stanfill's report that Mr. Engerseth's past childhood trauma and adolescent brain development limited his capacity to appreciate his conduct." After weighing the information provided, the trial court found that the mitigating evidence was insufficient to justify a sentence below the standard range:

> While Mr. Engerseth had adverse childhood experiences and is less mature than his chronological age and, therefore, of course, more impulsive and susceptible to outside influences, he has also shown an ability to stay mostly out of trouble with the courts until June 28, 2019. He is not disabled, and he has some family support in his paternal grandparents that many young people we see in our courts do not.

Although the court did not order an exceptional downward sentence, it did recognize Engerseth's youth, capacity for rehabilitation, and genuine remorse for his actions as the reasons for imposing a sentence below the midpoint of the standard range. Ultimately, the trial court sentenced Engerseth to 147 months for murder in the second degree and 17 months for vehicular homicide. As the sentences were to be run concurrently, the actual term of total confinement ordered was 147 months.

The record shows no abuse of discretion, no failure to exercise discretion, and no misapplication of the law at sentencing. While Engerseth argues the trial court failed to meaningfully consider youthfulness as a mitigating factor at sentencing, the record demonstrates the opposite. The mere fact that a trial court declined a defense request for a downward departure does not, alone, mean that the information presented was not meaningfully considered.

Engerseth relies on State v. Bassett, 192 Wn.2d 67, 428 P.3d 343 (2018), and State v. Delbosque, 195 Wn.2d 106, 456 P.3d 806 (2020), to support his contention that the trial court failed to meaningfully consider his youthfulness. Neither case governs here, as both address juvenile defendants being resentenced pursuant to Miller v. Alabama, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). In Bassett, the State Supreme Court addressed juvenile life without parole sentences, found that "children are less criminally culpable than adults," and held that it was unconstitutional to sentence a juvenile offender to life without the possibility of parole. 192 Wn.2d at 90. In Delbosque, after receiving a mandatory life sentence without the possibility of release, Delbosque was resentenced to a minimum term of 48 years. 195 Wn.2d at 111. Our Supreme Court noted that, "Bassett's prohibition on juvenile life without parole sets a high standard for concluding that a juvenile is permanently incorrigible." Id. at 118. In remanding for a new sentencing hearing, the Court held, "Miller hearings require sentencing courts to meaningfully consider 'mitigating factors that account for the diminished culpability of youth,' including 'the youth's chances of becoming rehabilitated.'" Id. at 120 (quoting RCW 10.95.030(3)(b)).

Engerseth was not a juvenile at the time he committed the offense; the record establishes that he was 22-years-old. While youth may still be a mitigating factor for individuals over the age of 18, O'Dell only went so far as to say "a trial court must be allowed to consider youth as a mitigating factor" in such circumstances. 183 Wn.2d at 696. Here, the trial court acknowledged its discretion in considering Engerseth's youthfulness as a mitigating factor to

potentially justify an exceptional sentence, but simply determined it was insufficient. This decision was within the trial court's discretion and was not based on untenable reasons. Accordingly, the standard range sentence imposed on this 22-year-old offender is affirmed.

WE CONCUR: